The DEAUVILLE CORPORATION, et al., Plaintiffs-Appellants,

v.

FEDERATED DEPARTMENT STORES, INC., et al., Defendants-Appellees.

No. 83–2496.

United States Court of Appeals, Fifth Circuit.

April 8, 1985.

Andrews, Kurth, Campbell & Jones, Paul E. Harris, Bradley Westmoreland, Houston, Tex., for plaintiffs-appellants.

Baker & Botts, David P. Cotellesse, N.K. Alexander, Jr., Reagan Burch, Houston, Tex., for Federated Dept. Stores, et al.

Vinson & Elkins, David M. Bond, Travis C. Broesche, Ann Lents, Houston, Tex., for Montgomery Ward and Co., et al.

Before CLARK, Chief Judge, JOLLY and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The Deauville Corporations and their principals, Thomas J. Gordon and Harry R. Jones, (collectively "Deauville") brought suit for damages and injunctive relief against Montgomery Ward & Company and its real estate subsidiary, Montgomery Ward Properties Corporation (collectively "Ward" unless otherwise indicated) and against Federated Department Stores, Inc., and Federated Stores Realty, Inc. (collectively "Federated" unless otherwise indicated). Deauville alleges violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and of Texas contract and business tort law, because of its loss of Ward, a prospective anchor tenant for Deauville's proposed shopping mall, to Federated, a developer of a nearby shopping mall.

The case was tried to a jury, but, after a lengthy and complicated trial, the court took the case from the jury at the last moment and directed verdicts in favor of the defendants on all issues. Deauville appeals. We affirm in part and reverse in part, and require a second trial that might well have been avoided had the court allowed the case to go to the jury.

### I.

Successful regional shopping malls require "anchor tenants." An anchor tenant usually owns its own building, the land beneath, and part of the adjacent parking area. Developers usually prefer one anchor tenant to be a mass merchandiser, such as Ward, and another to be a department store that sells fashion merchandise and similar goods. With anchor tenants at the ends of the mall, a flow of pedestrian traffic between the anchor stores attractive to small retail tenants along the mall interior is created. Developers acknowledge that without suitable anchor tenants, a mall will not have the ability to draw retail customers necessary to make the mall a good location for retailers.

In 1969 Federated, which owns several chains of department stores, bought a tract of land in north Harris County, Texas, near Houston. In 1973 it decided to develop a

shopping mall, eventually named Greenspoint, on that tract. It anticipated building the mall in more than one phase, and hoped eventually to have six anchor tenants. By 1974 Federated had commitments from two anchor tenants, one mass merchandiser and one department store. Another mass merchandiser seemed ready to commit to Greenspoint, and Federated was soliciting a second department store to balance against it.

Also during the early 1970's, Ward was seeking a retail store site in north Harris County and approached Federated regarding the possibility of locating at Greenspoint. Federated was not interested in adding another mass merchandiser to Greenspoint at that time, however, because it already had an imbalance between department-store and mass-merchandiser anchor tenants.

In 1973 Deauville decided to develop a mall on a site several miles from Greenspoint, near "farm-to-market" road 1960 (FM 1960). Learning that Ward was interested in locating in north Harris County, in March 1975 Deauville requested that Ward become a joint venturer in the 1960 project. Ward agreed, and on May 5, 1975, Ward Properties and Deauville entered into a joint venture agreement. The agreement provided for Deauville to secure an option to purchase the 1960 site, and for the parties to work together toward developing a mall on that site.

In June 1975 Deauville obtained a 120-day purchase option on the 1960 site. The option could be extended for up to one year. To extend the option beyond March 1976, however, the joint venture agreement required that Deauville have a written commitment from at least one anchor tenant to locate on the site. After acquiring the option, Deauville attempted to attract several department store anchor tenants to the project. Experiencing less success than it

had hoped, Deauville then decided to bring a national mall developer, Melvin Simon, into the effort.

After negotiating with Ward and Deauville, on November 26, Simon sent a letter to both of them memorializing their agreement and modifying the May 5 agreement between Deauville and Ward. The letter specified the share of the project to be owned by each of the three parties, and the capital contribution each was to make. One paragraph of the letter provided that any of the parties could cease making option payments from January through June if it so desired, and the two remaining parties would be allowed to purchase the interest of the withdrawing party.[1]

Meanwhile, by 1975 Greenspoint, which was to open in less than a year, had a commitment from its second mass merchandiser, and a second national department store had contacted Federated expressing an interest in Greenspoint. Also by 1975 Federated knew of the Deauville and Ward joint venture to develop the 1960 site, and was concerned not only about losing its prospective anchor tenant, Ward, to the 1960 project, but also about competition from the 1960 regional mall located only a few miles from Greenspoint. Federated decided to offer Ward an anchor tenant site at Greenspoint.

Because the 1960 project had no commitment from a department store, Ward negotiated with Federated about locating at Greenspoint while still involved in the Deauville joint venture. In March 1976, by paying Deauville's and Simon's share of the option payments, Ward obtained an extension of the 1960 site purchase option for the rest of the year—through June—without committing itself as an anchor tenant to the 1960 project. Then, in April, Ward and Federated reached an agreement. Ward decided to locate at Greenspoint, and withdrew from the Deauville joint venture.

1. The letter stated:

Any of the parties may cease option payment beginning with the subsequent payments due as of the end of January and continuing through June if they so desire, and the other parties shall have the opportunity to purchase the withdrawing partners interest. If both partners desire to purchase this interest, it would be on a proportionate basis as it now stands.

Deauville and Simon extended the site purchase option one month beyond its June expiration date, but shortly thereafter the project collapsed. Deauville brought suit against Federated and Ward.

Deauville alleged that Ward breached their joint venture agreement, or, in the alternative, breached the fiduciary obligation existing between joint venturers. It alleged that Federated and Ward tortiously interfered with its joint venture agreement with Ward Properties, and that Ward Properties tortiously interfered with its prospective business relations with Ward Stores. It further alleged that Federated and Ward combined to restrain trade, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, and finally, that Federated monopolized or attempted to monopolize rental mall tenant space in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. Deauville appeals the district court's granting of directed verdicts in favor of the defendants on all claims.

## II.

The standard under which this court reviews appeals from directed verdicts is well established:

> [T]he court should consider all of the evidence—not just that evidence which supports the nonmover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.

*Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) (en banc).

## III.

### A.

■■■ Deauville alleges that Federated monopolized and attempted to monopolize the market of leased regional mall space in north Harris County in violation of section 2 of the Sherman Act. To prevail on a monopolization claim, the plaintiff must prove by a preponderance of the evidence that the defendant has obtained "monopoly power" in the relevant market, and that the defendant improperly acquired or maintained that power "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). Thus, a monopolization claim consists of two elements: first, that the defendant obtained actual possession of "monopoly power" and, second, that the defendant's methods in acquiring or maintaining this power were improper. The attempt offense also has two elements: first, specific intent to monopolize; and, second, a dangerous probability that the attempt will be successful. *Dimmitt Agri Industries, Inc. v. CPC Intern. Inc.*, 679 F.2d 516, 525 (5th Cir.1982).

We hold that Deauville failed to adduce sufficient evidence to support a finding that Federated either obtained monopoly power or that there was a dangerous probability that Federated might have obtained monopoly power by offering Ward a position in Greenspoint.

The "monopoly power" which is a component of the "monopolization" offense must include the power to exclude competition effectively: "Price and competition are so intimately entwined that any discussion of theory must treat them as one. It is inconceivable that price could be controlled without power over competition...." *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). Even when viewed in the light most favorable to Deauville, the evidence adduced in this case will not support a finding that Federated acquired the power to exclude competition. The signifi-

cant evidence presented in support of Deauville's monopolization claim is: first, memoranda circulated by and among Federated employees indicating an intent to eliminate the potential competition of the 1960 project as the sole reason for inviting Ward to join Greenspoint; second, other evidence that Federated had no interest in admitting Ward to Greenspoint, but offered Ward favorable terms for entry only when Ward agreed to anchor the Deauville mall, threatening Greenspoint's position as the sole regional mall in north Harris County; and, third, the existence of Greenspoint for a period of a few years as the only regional mall in the north Harris County area. Under the circumstances of this case, this evidence cannot be considered sufficiently substantial to support a finding that Federated either obtained monopoly power or that there was a dangerous probability that Federated could have obtained monopoly power. Accordingly, we hold that the district court did not err in directing a verdict against Deauville on its monopolization and attempted monopolization claims. Let us explain our reasoning.

### B.

■ Certainly the most significant evidence presented by Deauville in support of the section 2 claims is the collection of memoranda among various Federated officials discussing Federated's incriminating reasons for inviting Ward into Greenspoint.[2] Viewing these memoranda and the other evidence of anticompetitive intent in the light most favorable to Deauville, a jury could reasonably find that Federated intended to weaken or destroy Deauville as a source of competition. Moreover, we assume without deciding that Deauville is correct in its contentions that the relevant geographic market is the Greenspoint trade area in north Harris County and that the relevant product market is in leased regional mall space, which does not include anchor tenant space. Nevertheless, the evidence here cannot be considered substantial support for Deauville's claims, for the reasons discussed below.[3]

2. The incriminating memoranda circulated among Federated officers included the following:

[Undated; no salutation and signature illegible]

If we can't get Joske's [a major department store in Texas] (and there's no assurance that we can, shouldn't we consider signing up Monty Ward & as this letter indicates stop the second centre. Bill will you poll our people & perhaps we should talk to Jim Selonick [senior vice president of Federated] about the problem.

October 28, 1975 from Federated official Bill Shiffick to four others:

I would appreciate your thoughts as regards Mr. Berman's [also affiliated with Federated] question regarding Montgomery-Wards as a suitable alternate to Joske's.

I strongly urge we talk to MW and head off a new center, if possible.

October 28, 1975 from one Federated official to Bill Shiffick:

1) I do not consider Mont. Ward a suitable alternate to Joske's at GG [Greenspoint]. With Penny's & Sears already there I feel MW will not enhance the prestige of the center as much as Joske's would.

2) It would only be worth considering if it were strictly a defensive measure to prevent the building of another center.

October 28, 1975 from Bill Shiffick to Mr. Berman:

Collective thoughts and recommendations of [four Federated officials] are that we make a strong recommendation to Mr. Selonick and F.S.R. that they work at bringing Montgomery Ward into the GreensGate center and that in doing so they enlist Montgomery Wards best efforts to also bring Joske's along with them to GreensGate.

This means a five (5) major store center, which we believe the best tactic to forestall another center being developed a few miles down the road.

3. The district court ordered a directed verdict on the antitrust claims against Deauville on several grounds, including the failure to prove either the geographic or the product market. It is by no means clear that the district court erred in this holding, and its opinion exhibits considerable thought and insight into the matter. However, because we reach our decision on separate grounds, we do not address this issue.

In addition to the preceding assumptions, we also assume without deciding that Deauville has alleged "antitrust injury." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

This court has given little weight to subjective intent when confronted with the absence, as a matter of economic reality, of the power to monopolize. *Dimmit* at 516. In that case, intracorporate memoranda among the defendant's officers indicated intent to monopolize. *Dimmitt* held that such evidence of intent was insufficient to allow the issue of market power to go to the jury under the facts in that case; accordingly, *Dimmitt* reversed the jury verdict on the monopolization claim and ordered judgment for the defendant, CPC:

> [A]ssuming the CPC memoranda proved the company's monopolizing intent, did Dimmitt nonetheless present sufficient evidence, or indeed any evidence, that CPC actually possessed monopoly power ...? In short, was there any evidence presented to the jury to demonstrate that, regardless of the assumptions held by CPC management about their power to control prices and exclude competitors, CPC in reality possessed monopoly power during this period?

> . . . .

> We do not dispute Dimmitt's contention that its memoranda evidence, weighed with all reasonable inferences drawn in favor of the jury verdict ... supports the conclusion that ... CPC exercised a significant degree of control over price. We conclude, however, that this ... evidence alone is insufficient to overcome the presumption against monopoly power implied by CPC's indisputably low market shares.... (Footnote omitted.)

*Dimmitt* at 525, 531.

The undisputed evidence of the present case shows that Greenspoint did not gain or preserve any substantial market power by its agreement with Ward. Deauville contends that it was only the absence of a national mass merchandiser which prevented the development of the FM 1960 mall. Deauville argues that Federated had the power to exclude the FM 1960 project as a competitor by securing Ward for Greenspoint and thereby depriving Deauville of the last mass merchandiser available to anchor a regional mall at the 1960 site. Deauville argues that neither Sears, Penney's nor Ward was willing to place a store at both Greenspoint and the 1960 site because of the danger that two stores located so close together would divide the available customer pool, a problem termed "customer transfer" at trial.

However, Deauville must do more than show it was damaged as a competitor; Deauville must show that Federated could exclude competition. The evidence here is, we will assume without deciding, sufficient to show that the defendant could exercise some *de minimis* short-term control over price—by virtue of Greenspoint's having been the first regional mall to open in the north Harris County area. The trial record will not support a finding, however, that Federated ever had any power to exclude competition. The evidence at trial showed that the FM 1960 site was not the only mall site available in the north Harris County area; the retail market studies relied on by Deauville at trial clearly indicate at least two other mall sites within the Greenspoint trade area. Although Deauville asserts these sites were less desirable than the 1960 site, both of them were developed into regional malls: Willowbrook and Deerbrook. The trial record indicates that at the time of trial Willowbrook had opened and Deerbrook was being planned. Deauville contends, however, that these developments occurring after Deauville's collapse but before trial of this case should not preclude a finding that Federated enjoyed monopoly power for a brief period of time. Sears and Penney's, however, are both enormous mass merchandisers either of which is capable of anchoring a large number of regional malls, including Willowbrook and Deerbrook, for both of which, the record shows, Sears is an anchor. There is no evidence that these enormous firms could not have served the market if the demand had been sufficient. *See generally:* Landes & Posner, *Market Power in Antitrust Cases*, 94 Harv.L.Rev. 937, 964–67 (1981) (explaining that where a firm already substantially supplies a market, the

firm's resources are normally available to the market if demand so warrants); 1984 Department of Justice Merger Guidelines (where rapid actual entry occurs, market power is to be considered *de minimis*).

Neither Deauville's expert, Harper, nor any other witness testified that the alternative mall sites could not have been developed almost as rapidly as the FM 1960 site if demand in the north Harris County trade area had warranted such an expansion of regional retail facilities. Harper, for example, essentially restricted his considerations to the two developers, Federated and Deauville, who were actively soliciting department stores at the time; Harper did not testify that there was any reason known to him that either the Willowbrook or Deerbrook sites could not have been developed more rapidly if demand had warranted it. Although Harper testified on many points, he summarized his testimony on the issue of the effect on competition in the north Harris County area as follows:

> So these department stores recognized this was going to be a good area for them. In fact, if you have the population of that area, it is almost as big as the size of the City of Austin, Texas. If you are a Houston developer, you don't have to go to Austin to find another area to develop. So you have Sears, J.C. Penney, and Montgomery Ward as the major mass merchandisers looking in that area. And ·you have only two competitors vying to secure those department store tenants. And those department store tenants are important because without the department store tenants, you can't develop a regional mall, and you can't offer that mall space to other people in the area. So when Montgomery Ward left the Deauville venture and went down to Greenspoint Mall, in my opinion, this killed the opportunity to have competition between renters of regional mall space in the area, because there was only

one mall that was developed during that time frame.

Harper considered only the two malls. His testimony addressed the elimination of a competitor, not competition, except in immediate terms.[4] This court has held that the intentional elimination of even a substantial competitor alone will not ordinarily suffice to allow the issue of market power to go to the jury. *Associated Radio v. Page*, 624 F.2d 1342, 1353 (5th Cir.1980). Thus because the evidence adduced by Deauville is insufficient to support a finding of market power, its monopolization claim must fail.

C.

■ Turning now to the claim of attempted monopolization, we reiterate that Deauville is required to prove both specific intent to monopolize and a dangerous probability that the attempt would succeed. In support of its attempted monopolization claim, Deauville presents the same evidence it presents in support of its monopolization claim: the Federated memoranda, other evidence of anticompetitive intent, and the persistence of Greenspoint as the sole regional mall in north Harris County for a period of a few years. This evidence is sufficient to show specific intent; what is lacking is evidence which would support a finding of a dangerous probability that an attempt would succeed. We have already held that the evidence adduced in this case is insufficient to show that competition from the alternative mall sites was precluded. Indeed, the record shows that two regional malls were developed in the market area within a relatively brief period of time. In a market which would allow such competition there was no dangerous probability that an attempt to monopolize could succeed. Accordingly, there is insufficient support for a finding of a dangerous probability of monopolization. We conclude that Deauville has failed to present

---

**4.** The Second Circuit's reasoning in a recent case decided under the Clayton Act casts light here: "In the present case, a market definition artificially restricted to existing firms competing at one moment may yield market share statistics that are not an accurate proxy for market power when substantial potential competition able to respond quickly to price increases exists." *United States v. Waste Management,* 743 F.2d 976 (2d Cir.1984).

sufficient evidence for its section 2 claims to withstand a motion for directed verdict under *Boeing*. We therefore affirm the district court's directed verdict on the section 2 claims.

## IV.

### A.

Section 1 of the Sherman Act, 15 U.S.C. § 1, provides that "every contract, combination ... or conspiracy in restraint of trade or commerce ... is ... illegal." Deauville alleges three combinations in violation of section 1, each leading to the collapse of the FM 1960 project: one between Federated and Federated Realty, one between Ward and Ward Properties, and one between Federated and Ward. The district court held that Ward's locating at Greenspoint did not harm competition. Applying a rule of reason analysis, the district court directed a verdict in favor of the defendants on the section 1 claims.

■ Ward Properties is Ward's wholly owned subsidiary, and Federated Realty is Federated's wholly owned subsidiary; wholly owned subsidiaries are incapable of conspiring with their parent as a matter of law. *Copperweld Corp. v. Independence Tube Co.*, —— U.S. ——, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). We therefore affirm the directed verdict against Deauville on these two alleged violations of section 1.

### B.

We also affirm the directed verdict with respect to Ward's combination with Federated. Because this case involves no *per se* violations of antitrust law, the district court correctly determined that the combination between Ward and Federated should

be analyzed according to the rule of reason. *Broadcast Music, Inc. v. Columbia Broadcasting System*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979).

> To prove an antitrust violation under the rule of reason ... [the plaintiff] must show the defendants' conduct adversely affected competition.... An evil intent alone is insufficient to establish a violation under the rule of reason, although proof of intent may help a court assess the market impact of the defendants' conduct.

*Northwest Power Products v. Omark Industries*, 576 F.2d 83, 90 (5th Cir.1978) [5] (affirming summary judgment for defendants on issue of section 1 conspiracy).

■ Thus, for Deauville's section 1 claim to survive a motion for a directed verdict, Deauville must, among other things, present evidence capable of supporting a finding that the Federated-Ward combination adversely affected competition in the north Harris County market. In this regard, Deauville relies on the same evidence it adduced to support its section 2 claims; we hold that this evidence is also insufficient to support the section 1 claim. As discussed above, Deauville has not presented substantial evidence that Federated's arrangement with Ward adversely affected competition because Deauville failed to show that competition from alternative mall sites was precluded. Even assuming the arrangement between Federated and Ward was unfair to Deauville, "*only* if the defendant can gain an increment of monopoly [6] through his unfair competition would the additional sanctions of the Sherman Act ... be appropriately used to deter him." *Id.* (emphasis added). Deauville has failed to make such a showing. Where a defendant uses unfair meth-

---

**5.** *Contra Albert Pick-Barth v. Mitchell Woodbury,* 57 F.2d 96 (1st Cir.1932). After a thorough consideration of the issues involved, this circuit rejected *Pick-Barth* in *Northwest Power* where we held that if a defendant's acts have not palpably injured competition and produced an impermissible degree of market power there could be no violation of section 1 in a case governed by the rule of reason. *Northwest Power,* at 90. Accordingly, to the extent to which

*Multiflex v. Samuel Moore,* 709 F.2d 980 (5th Cir.1983) conflicts with *Northwest Power, Multiflex* is not good precedent.

**6.** "Monopoly" here is used to refer to unlawful "market power," not that extreme degree of market power termed "monopoly power"; *Northwest Power* did not involve a monopolization claim.

ods to eliminate a competitor from the market, but does not harm competition, at most a claim for "unfair competition" can be made out. *Id.* Congress has repeatedly declined to create a private federal law of unfair competition. *Id.* at 88. In addition, the policies of state unfair competition laws and the federal antitrust laws are often in conflict; an act condemned by the former need not violate the latter. *Id.* at 89. Accordingly, we affirm the directed verdict against Deauville on this issue.

### V.

We now turn to the claims of Deauville against Ward based on Texas state law. Deauville alleges that Ward breached its joint venture agreement with Deauville and, alternatively, that Ward violated its fiduciary duty to Deauville, its joint venture partner.

The district court held that Deauville and Ward reached a binding agreement in May of 1975, which they modified in November. It held that the agreement was unambiguous, and, according to the November modification, clearly granted each party the right to withdraw from the joint venture from January through June of 1976. According to the district court, the parties intended the paragraph memorializing their agreed right to cease option payments only to establish a right of succession to partnership interests. The district court concluded that because Ward exercised a right explicitly granted by the terms of the agreement, as a matter of law, it did not breach its contract with Deauville, nor any fiduciary duty owed toward it. We affirm.

Deauville argues that the words "cease option payment," as used in the November 26 letter, reserved to the parties only a right to stop making payments to keep the purchase option alive, and did not reserve the right to withdraw from the venture or the right to decline to make the final payment necessary to exercise the purchase option. It argues that if the parties had intended to reserve a right not to exercise the purchase option, then, consistent with real estate parlance, they would have used some words other than "option payment" to refer to the initial purchase payment. In the alternative, Deauville argues that the contract is ambiguous and its meaning therefore presents a jury question.

Whether a contract is ambiguous is a question of law. A contract is not ambiguous if worded so that a court may give it a certain legal meaning or interpretation. *South Hampton Co. v. Stinnes Corp.*, 733 F.2d 1108, 1115 (5th Cir.1984) (applying Texas law). We agree with the district court that according to the unambiguous terms of their agreement, Deauville and Ward reserved a right for either of them to withdraw from the venture at any time until exercise of the purchase option in June of 1976.

According to Texas law, we must interpret the joint-venture agreement according to the intent of the parties as expressed in or apparent from an unambiguous writing. *Watkins v. Petro-Search, Inc.*, 689 F.2d 537, 538 (5th Cir.1982) (applying Texas law). We must construe the writing in its entirety, and consider each part with every other part. *United States Steel v. Whitley*, 636 S.W.2d 465, 469 (Tex. App.1982). Additionally, we must ascertain the intent expressed in the writing by looking not only to the entire agreement, but also the circumstances surrounding its execution. *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex.1980). In this case the entire agreement and circumstances surrounding it indicate that the parties intended each joint venturer to have the right to withdraw from the 1960 project until exercise of the purchase option.

Although Ward and Deauville, and later Simon, entered into an agreement to develop a regional shopping mall, the mall was to be built on a site for which they held only a renewable, non-binding purchase option. From the outset, construction of the mall was contingent upon the parties' obtaining commitments from essential anchor tenants. The November modification expressly mentioned this fact. Finally, no "option payments," as Deauville

would define the phrase, came due in June; the last payment to keep the option alive for a full year became due months earlier. The only payment that the parties could have made in June was the payment to exercise the purchase option. Because the periodic payments applied toward the downpayment if the parties decided to exercise their option, however, the final June payment resembled the previous periodic payments.

Thus, notwithstanding Deauville's interpretation of "option payment," and whatever meaning those words may have in the real estate community, in the context of their agreement the right to cease "option payments" through June cannot logically be interpreted to mean anything other than that the parties intended to allow any of them to withdraw from the project until time to make a final payment to exercise their purchase option. Ward, then, did not breach its agreement with Deauville, because it had a right under the contract to withdraw as it did.[7]

 Because Ward had a right to withdraw from the venture, we also agree with the district court that Ward did not breach any fiduciary duty owed to its joint venturer, Deauville. Joint venturers owe each other a duty of utmost good faith and scrupulous honesty in their mutual endeavor. E.g., *Fitz-Gerald v. Hull*, 150 Tex. 39, 237 S.W.2d 256 (1951). This fiduciary duty, however, does not extend so far as to create duties in derogation of the express terms of the joint venture agreement. *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 485 (5th Cir.1984) (collecting cites). Additionally, unless the parties agree otherwise, Texas statutory law

gives them an absolute right to abandon the joint venture at will. *See* TEX.REV. CIV.STAT.ANN. art. 6132b § 31(1)(a) (Vernon 1970); *Thompson v. Thompson*, 500 S.W.2d 203 (Tex.Civ.App.1973). We therefore decline to apply the equitable rule of fiduciary duty to override both the accepted rule of Texas law and the express terms of the joint venture agreement.

## VI.

Deauville next alleges that Federated and Montgomery Ward, the parent, tortiously interfered with Deauville's joint venture contract and prospective business relationship with Ward Properties and that Federated and Ward Properties tortiously interfered with Deauville's prospective business relations with Montgomery Ward. The district court issued a directed verdict in favor of the defendants on these claims. For the reasons discussed below, we reverse the directed verdict on the issue of Federated's alleged interference with the Deauville-Ward prospective business relationships and with the Deauville-Ward Properties contract, but we affirm the district court in all other respects.

## A.

 We first examine Deauville's claim against Federated and Montgomery Ward for interference with the Deauville-Ward Properties contract. "Generally, in order to maintain an action for contractual interference, it must be established that (1) there was a contract subject to interference, (2) the act of interference was willful and intentional, (3) such intentional act was a proximate cause of plaintiff's damage, and (4) actual damage or loss occurred."[8]

---

7. Deauville also argues that any right the parties had to withdraw from the venture was conditioned upon compliance with the terms of the November 26 letter and thus could be exercised only by cessation of the periodic payments necessary to keep the site purchase option alive. We agree with the district court that the language of the agreement was not conditional, and therefore was not intended to limit the manner in which the parties could withdraw from the venture.

8. We express no opinion as to what amount of damages the evidence here might reasonably support, although we believe a jury could reasonably find at least some damages have been demonstrated. We do note, however, that Texas law does not permit recovery of prospective profits for a newly established business. *Keener v. Sizzler Family Steakhouses*, 597 F.2d 453 (5th Cir.1979); *McBrayer v. Teckla*, 496 F.2d 122 (5th Cir.1974). We do not decide whether this rule has application in the present case, but leave the matter in the first instance to the trial court.

*Diesel Injection Sales & Services v. Renfro,* 656 S.W.2d 568 (Tex.App.1983).

At the outset, we must reject the defendant's argument that interference with the terminable-at-will joint venture agreement between Deauville and Ward Properties is not actionable under any circumstances. The defendants cite *Claus v. Gyorkey,* 674 F.2d 427, 435 (5th Cir.1982) (applying Texas law) and *Davis v. Alwac International, Inc.,* 369 S.W.2d 797, 801–02 (Tex.Civ.App.1963) for the proposition that according to Texas law, a contract terminable at will absolutely cannot support a claim for tortious interference. The language of *Davis,* the sole case upon which the court relies in *Claus,* does not support unequivocally the proposition that interference with at-will contracts is never actionable:

> But, is the contract of employment terminable at any time at the will of either party breached by a third person's inducement causing or bringing about the termination of such a contract? We think not. This is especially true in the present instance since [the defendants] were involved economically and believed that the continuation of the employment contract was to their disadvantage.

369 S.W.2d at 802 (citations omitted).

In *Davis* the defendants were major shareholders in a corporation which employed the plaintiff whom the defendants induced the corporation to fire. As discussed below, the defendants' stock ownership constituted a superior economic interest which privileged their actions. *Davis* does not categorically deny recovery for tortious interference with the terminable-at-will contract, but rather denies recovery where the alleged interfering party holds a privilege to interfere based on his superior economic interest. We read *Claus* as holding only that that case was controlled by *Davis.*

Our research has revealed many Texas cases allowing tortious interference claims for interference with terminable-at-will contracts without discussing the issue. *See Diesel Injection Sales & Services, Inc. v.* *Renfro,* 656 S.W.2d 568 (Tex.App.1983). (employment contract); *Panama-Williams, Inc. v. Lipsey,* 576 S.W.2d 426, 434 (Tex.Civ.App.1978) (joint venture agreement); *Hampton v. Sharp,* 447 S.W.2d 754, 758 (Tex.Civ.App.1969) (employment contract); *cf. Cook Industries, Inc. v. Community Grain, Inc.,* 614 F.2d 978 (5th Cir.1980) (applying Texas law; customer's contract with bank); *South Central Livestock Dealers, Inc. v. Security State Bank of Hedley,* 551 F.2d 1346, 1348, 1351 (5th Cir.1977) (applying Texas law; agency relationship or contract implied-in-fact); *CF & I Steel Corp. v. Pete Sublett and Co.,* 623 S.W.2d 709, 715 (Tex.Civ.App.1981) (supply contract). The relations defined by at-will contracts are intermediate on the continuum whose ends are marked by more inchoate "prospective business relations" and the more complete relations defined by contracts not terminable at will; Texas law indisputably protects these latter two relations. *Terry v. Zachry,* 272 S.W.2d 157, 158 (Tex.Civ.App.1954); *Harshberger v. Reliable-Aire, Inc.,* 619 S.W.2d 478, 481 (Tex.Civ.App.1981). To leave at-will contracts unprotected while protecting relations both more and less complete would be inconsistent with the principles protecting these other two relationships. We therefore hold that if tortious interference with the joint venture agreement between Deauville and Ward in fact occurred, the tort is actionable under Texas law.

The evidence of anticompetitive intent adduced by Deauville is sufficient to permit a jury to find that Federated acted intentionally or, arguably, even with malice towards Deauville. Federated admitted that it did not need Ward at Greenspoint at the time Ward became a joint-venturer with Deauville. Federated became interested in securing Ward only after Ward entered into the agreement with Deauville to construct a competing regional shopping mall. Although Federated contends that its timing was coincidental with Greenspoint reaching a stage of development ripe for bringing in another anchor tenant, internal Greenspoint memoranda indicate that some

of Federated's decision-makers favored offering Ward a store site, not to advance Federated's legitimate economic interests, but solely to prevent Ward's going to the 1960 site or to block development of the 1960 site altogether. From these and other facts, a jury could conclude that Federated acted maliciously or intentionally toward Deauville and the 1960 project by luring away Deauville's joint venturer and prospective anchor tenant.[9]

### B.

■ Deauville also alleges that Federated and Ward Properties tortiously interfered with Deauville's prospective business relationship with Montgomery Ward, the parent corporation of Ward Properties and that Federated and Montgomery Ward tortiously interfered with the Deauville-Ward Stores prospective business relationship. This court has previously set out the elements of the tort:

> For a plaintiff, such as in the instant case, to prevail, he must show that (1) there was a "reasonable probability" that he would have entered into a contractual relationship; (2) defendant acted maliciously by intentionally preventing the relationship from occurring with the purpose of harming plaintiff; (3) the defendant was not privileged or justified, and (4) actual harm or damage occurred as a result. *Cf. Light v. Transport Insurance Co.*, 469 S.W.2d 433 (Tex.Civ.App. 1971) reh. den.

*Leonard Duckworth v. Michael L. Field*, 516 F.2d 952 (5th Cir.1975) (interpreting Texas law). The tort of interference with a prospective business relationship does not require the existence of a contract but the tort does require that "malice" be shown. In at least these regards this tort differs

from the tort of interference with a contract. Montgomery Ward had no contract with Deauville; accordingly, if Deauville is to recover for an interference with its relationship with Montgomery Ward, Deauville must proceed on the theory of interference with a prospective business relationship, not a contract. The evidence here, though subject to differing interpretations, could support a jury finding of malice on Federated's part, as noted previously. We discuss the issue of "privilege" below.

### C.

■ Deauville has no claim for tortious interference with contract or prospective business relations against Ward. According to Texas law, a plaintiff cannot recover for tortious interference with contract or with business relations if the allegedly interfering third party acted to protect his own legitimate interest. *Black Lake Pipe Line Co. v. Union Construction Co.*, 538 S.W.2d 80, 90 (Tex.1976).[10] A financial interest superior to that of one of the parties to the contractual or business relationship is one such legitimate interest. *Davis v. Lewis*, 487 S.W.2d 411 (Tex.Civ.App.1972). Stock ownership generally constitutes a superior financial interest that will trigger the privilege. *Consolidated Petroleum Industries, Inc. v. Jacobs*, 648 S.W.2d 363, 367 (Tex.App.1983).

■ We hold that the financial interest privilege applies to Deauville's tortious interference claims against Montgomery Ward & Co., the parent of Ward Properties; similarly, Ward Properties cannot be liable for interference with Montgomery Ward's prospective business relationship with Deauville. Montgomery Ward created Ward Properties, a wholly owned subsidiary, for the purpose of real estate development. Montgomery Ward controlled

**9.** We recognize a degree of incongruity, at least on the surface, in an opinion striking down the federal antitrust claims and yet finding evidence of malice necessary to support the state claim of unlawful interference. At least one important distinction to be made is, broadly speaking, that the federal law protects competition; the state law, requiring no finding regarding market power, protects the competitor.

**10.** *See also Hunt v. Coastal States Gas Producing Co.*, 570 S.W.2d 503, 510 (Tex.Civ.App.1978) (contractual or business relations); *Panama-Williams, Inc. v. R.L. Lipsey*, 576 S.W.2d 426, 434 (Tex.Civ.App.1978) (joint venture agreement); *Davis v. Lewis*, 487 S.W.2d 411, 414 (Tex.Civ.App.1972) (business relations); *Hampton v. Sharp*, 447 S.W.2d 754, 758 (Tex.Civ.App. 1969) (terminable-at-will contract).

the operation of Ward Properties, and any profits Ward Properties made accrued to the benefit of Montgomery Ward, the shareholder. In fact, the interests of Montgomery Ward and Ward Properties are aligned so closely that we have difficulty even recognizing their separate identities for the purpose of this analysis.

D.

█ Even if Federated acted intentionally or with malice, it incurs no liability on any interference claim if its actions were privileged:

Defendant's malicious interference in plaintiffs' reasonable expectancy [or contract] could be excused if it were privileged or resulting from legitimate business considerations. The most frequently articulated privilege that is asserted to defend against the tort of wrongful interference is that of reasonable competition in the solicitation of contracts. This privilege however is limited to what is considered within the realm of "fair play." In *Light v. Transport Ins. Co.* [469 S.W.2d 433 Tex.Civ.App. (1971)], a case dealing with interference by a competitor with the renewal of an insurance policy issued by the plaintiff, the Texas court cited approvingly the following language:

* * * The courts take the position that if means of competition are fair, advantage should remain where success has put it, but if acts complained of do not rest on some legitimate interest or *if there is sharp dealing or overreaching or other conduct below the behavior of fair men similarly situated, the ensuing loss should be redressed.* [Emphasis supplied.] [45 Am.Jur.2d *Interference* § 1 (1969).]

*Leonard Duckworth* at 957–58.

Whether Federated is protected from liability by the superior interest privilege is a matter for the jury to determine. The district court dismissed the tort claims against Federated on the basis that Deauville did not prove that Federated did anything other than compete with Deauville on the merits, or that Federated acted wilfully and maliciously toward Deauville. Our review

of the record, however, reveals that Deauville adduced enough evidence to present a jury question on this close issue. The memoranda adduced here would permit a jury reasonably to find that Federated acted only to harm Deauville; an issue should not be taken from the jury simply because the court would not agree with such a finding. We therefore reverse the district court's order granting directed verdicts in favor of Federated on Deauville's tortious-interference claims, leaving the issue of "privilege" for the jury.

VII.

In summary, we reverse the district court's directed verdict on Deauville's claims against Federated for interference with the Deauville-Ward partnership contract and with their prospective business relationship. We affirm the district court's directed verdict against Deauville on all other claims. Accordingly, we remand this case to the district court for action consistent with this opinion.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.