C.E. SERVICES, INC., Plaintiff-Appellant,

v.

CONTROL DATA CORPORATION, Defendant-Appellee.

No. 83–1632.

United States Court of Appeals, Fifth Circuit.

May 13, 1985.

---

Shapiro, Edens & Cook, Paul J. VanOsselaer, Joseph Latting, Gregory C. Douglass, on the brief, Clark, Thomas, Winters & Newton, Austin, Tex., for plaintiff-appellant.

Kelley V. Rea, Minneapolis, Minn., Strasburger & Price, Ernest R. Higginbotham, Kevin B. Wiggins, Dallas, Tex., for defendant-appellee.

Before CLARK, Chief Judge, GOLDBERG and RUBIN, Circuit Judges.

GOLDBERG, Circuit Judge:

IBM makes machines, and machines break down. Seizing on this windfall opportunity, others have joined IBM in the mission to keep our nation's computers running. These somewhat parasitic entities are called "third-party maintenance firms."

Defendant-appellee Control Data Corporation is in the business of providing maintenance services for IBM 360 and 370 systems in the Dallas-Tarrant County area of Texas. In the summer of 1978, three employees of Control Data left the firm to form plaintiff-appellant C.E. Services, Inc. ("CES"), which in July of that year joined the IBM computer maintenance business, providing the same repair services as Control Data, other third-party maintenance firms, and IBM itself.

CES entered the world of third-party maintenance with a bang, soliciting customers from among those who were already aware of the capabilities of the former Control Data employees—that is, they seduced Control Data's clients. Ultimately, three of Control Data's clients cancelled their month-to-month contracts with the firm after having tendered their contractually required thirty-day notices of cancellation. By August of 1978, two additional Control Data customers had become serious prospects for CES.

Control Data responded in kind. As the result of an organizational meeting that August, the company contacted the CES converts and prospective converts in an effort to persuade them to return to or remain with Control Data. It offered to each a ten-percent price discount in exchange for a one-year obligation instead of the usual month-to-month agreements. The new discount supplemented a traditional five-percent discount that had been avail-

able to customers paying for an entire year's maintenance contract in advance.

The tactic apparently was effective, as CES went out of business for approximately one year. (Interestingly, the deceased revived: in 1979, CES obtained two maintenance customers from Control Data, at least one of which switched because CES offered to perform at a price lower than Control Data's.) Desolate and with no one else to turn to, CES filed suit in federal district court, alleging that Control Data's conduct violated section 2 of the Sherman Act, 15 U.S.C. § 2 (1982), as well as state common law norms prohibiting interference with existing contractual and prospective business relationships. The district court eventually dismissed each claim on summary judgment and, severing the remaining counterclaims and third-party claims, entered a final judgment as to plaintiff's claims pursuant to Fed.R.Civ.P. 54(b). Because we believe that summary judgment was improperly granted as to the federal antitrust claims as well as to one of plaintiff's state law claims, we reverse and remand for a trial on these issues.

## I. MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION

 Section 2 of the Sherman Act brands as outlaw "[e]very person who shall monopolize, or attempt to monopolize ... any part of the trade or commerce among the several States...." 15 U.S.C. § 2. Monopoly power, in turn, is "the power to control price or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1004–05, 100 L.Ed. 1264 (1956). The offense of completed monopolization requires proof of two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grin-*

*nell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). Similarly, the section 2 plaintiff must prove two elements for the attempt offense: (1) specific intent to accomplish the illegal result, and (2) a dangerous probability that the attempt will be successful. *United States v. American Airlines, Inc.*, 743 F.2d 1114, 1118 (5th Cir.1984); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 490 (5th Cir.1984); *Spectrofuge Corp. v. Beckman Industries, Inc.*, 575 F.2d 256, 276 (5th Cir.1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979).

 A prerequisite to success under section 2 on either a completed or attempted monopolization claim is proof of the relevant market. *E.g., Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965); *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d at 276. "The relevant market establishes the backdrop against which to measure economic power." *In re Municipal Bond Reporting Antitrust Litigation*, 672 F.2d 436, 441 (5th Cir.1982). The relevant market inquiry, of course, has both geographical and product elements, *Domed Stadium*, 732 F.2d at 487, as to which the plaintiff bears the burden of proof, *du Pont*, 351 U.S. at 381, 76 S.Ct. at 999.

 Because this case comes to us on summary judgment, our analysis of the relevant service [1] market is necessarily circumscribed. The moving party must have shown, in light of the entire record, that there was no genuine issue as to any material fact and that the district court was therefore justified in entering judgment as a matter of law. Fed.R.Civ.P. 56(c); *e.g., Poller v. Columbia Broadcasting System*, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). This inquiry involves competing considerations. On the one hand, we must draw all reasonable inferences in favor of the party opposing the

---

**1.** Section 2's proscription applies with equal force to both service and product markets. *See, e.g., United States v. Connecticut Nat'l Bank*, 418 U.S. 656, 659–62, 94 S.Ct. 2788, 2791–93, 41 L.Ed.2d 1016 (1974); *Grinnell*, 384 U.S. at 572–76, 86 S.Ct. at 1704–05.

motion, *e.g., United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam), but on the other hand, the nonmoving litigant must point to "significant probative evidence" demonstrating the existence of a triable issue of fact, *e.g., Municipal Bond,* 672 F.2d at 440. On the one hand, summary judgment is especially disfavored in "complex, fact-sensitive antitrust cases," *see Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 505, 89 S.Ct. 1252, 1259–60, 22 L.Ed.2d 495 (1969); *Poller,* 368 U.S. at 473, 82 S.Ct. at 491, but on the other hand, " 'simply because a case is based upon the antitrust laws does not suspend the application of Rule 56,' " *Domed Stadium,* 732 F.2d at 486 (quoting *Aladdin Oil v. Texaco, Inc.,* 603 F.2d 1107, 1111 (5th Cir.1979)). "In short, the requirements of Rule 56 are no less applicable in antitrust actions." *Municipal Bond,* 672 F.2d at 440; *see First National Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 287 n. 18, 88 S.Ct. 1575 (1968); *Bayou Bottling, Inc. v. Dr. Pepper Co.,* 725 F.2d 300, 303 (5th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 123, 83 L.Ed.2d 65. *See generally* 2 P. Areeda & D. Turner, *Antitrust Law* ¶ 316, at 57–59 (1978).

The parties do not contest that the relevant geographic market is the Dallas-Tarrant County area. CES maintains, however, that the relevant service market comprises only third-party maintenance firms, to the exclusion of IBM. On appellant's view, if third-party firms are found to constitute a distinct submarket for the maintenance of IBM 360 and 370 computers, then Control Data owns an 83% share of the relevant market. Appellee counters that IBM, which itself offers to maintain the 360 and 370 lines, furnishes a service indistinguishable from that of the third-party firms and should therefore be included in a unitary market for the maintenance of these machines. The consequence of appel-

lee's market definition is that IBM's 60–65% share relegates Control Data to between 20 and 25%, thereby rendering appellant's section 2 claims unsustainable as a matter of law. *See Dimmitt Agri Industries v. CPC International, Inc.,* 679 F.2d 516 (5th Cir.1982), *cert. denied,* 460 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983).[2]

We approach this issue with some trepidation, mindful of the ad hoc, fact-specific core embedded in any determination of relevant market. *See Heatransfer Corp. v. Volkswagenwerk, A.G.,* 553 F.2d 964, 979 (5th Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Sulmeyer v. Coca Cola Co.,* 515 F.2d 835, 849 (5th Cir.1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976). The oft-repeated bromide that courts are reluctant to dismiss cases on summary judgment is as much an observation as it is an admonishment. When appropriate, we will readily walk the efficient countours of Rule 56, but the nature of the antitrust beast is such that courts cannot frequently say as a matter of law that plaintiffs have no disputed material facts upon which to proceed to trial. The facts of this case prescribe that we swallow the bromide.

Appellee argues forcefully, as did the district court below, that because IBM and the third-party firms provide identical services, the third-party firms do not constitute a separate market for purposes of section 2. Appellee correctly avers to the delineation in *Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), in which the Supreme Court stated that "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Id.* 370 U.S. at 325, 82 S.Ct. at 1523–24 (footnote omitted); *see NCAA v. Board of Regents,* —— U.S. ——, 104 S.Ct. 2948, 2966, 82 L.Ed.2d 70 (1984). Appellee claims that

---

**2.** We find it unnecessary to decide whether a defendant's 25% share of the relevant market might be sufficient to sustain an attempted monopolization claim against it. *See Multiflex, Inc. v. Samuel Moore & Co.,* 709 F.2d 980, 990–94

(5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984); *Dimmitt,* 679 F.2d at 531–33 & n. 18; *see also United States v. American Airlines, Inc.,* 743 F.2d 1114, 1118–21 (5th Cir.1984).

nothing in the record refutes that the services of IBM and of the third-party firms are reasonably interchangeable or reflect a high cross-elasticity of demand.

While identity of services undoubtedly plays a significant part in the relevant market determination, *Brown Shoe* and its progeny contemplate that a variety of factors will inform the analysis. Recognizing the possibility of valid subdivisions within an apparently overarching market definition, the *Brown Shoe* Court stated that

> within this broad market, well-defined subdivisions may exist which ... constitute product markets for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price charges, and specialized vendors.

*Id.* (citations omitted). The existence of one or more of these indices does not necessarily preclude a summary determination that certain products or services either are reasonably interchangeable or demonstrate a high cross-elasticity of demand. However, where a plaintiff has by substantial probative evidence raised fact issues material to the ultimate market definition the possibility that any single countervailing

factor will outweigh these issues as a matter of law is slight.[3]

In the present case, CES has presented affidavits, documentary evidence, and deposition testimony for the propositions that third-party maintenance firms view themselves collectively as a service industry apart from IBM; that the marketing and competitive strategies of Control Data in particular focused solely on other third-party firms to the exclusion of IBM; that consumers of third-party maintenance services do not readily substitute services from IBM (and that the converse is similarly untrue); that there is a ubiquitous price differential of some 20–25% between IBM's higher fees and those of the third-party firms; and that the third-party firms are, unlike IBM, specialized service vendors of the 360 and 370 computer systems.[4] Control Data disputes the veracity of each point,[5] but the resolution of these factual issues is for another place and another time. We cannot say at this inchoate stage that a factfinder would be precluded from reasonably inferring the existence of a relevant submarket of third-party maintenance firms, nor could we say that judgment *non obstante verdicto* would necessarily follow a verdict excluding IBM from the relevant market.

█ Control Data further contends that even if the district court erred by including

---

3. As we noted in *Yoder Bros., Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1367 (5th Cir.1976), *cert. denied*, 429 U.S. 2094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977), "Factors such as functional interchangeability, responsiveness of the sales of one product to the price changes of the other, and degree of competition from the potential substitute are all relevant to the market inquiry." *See also Hornsby Oil Co. v. Champion Spark Plug Co.*, 714 F.2d 1384, 1393 (5th Cir.1983).

4. *See* Richardson Deposition at 237–38; Seidel Deposition at 9–10; Vander Luqt Deposition at 29; Richardson Affidavit at 5; Russey Affidavit at 5–6; Exhibits 176, 183, 186.

5. Appellee does not dispute the existence of a differential between the prices of IBM and the third-party firms, but contends instead that the differential is irrelevant because CES has not shown how the price variance indicates the existence of a relevant submarket. While it is

certainly true that a price differential is not necessarily dispositive in determining the interchangeability of products, *see, e.g., Acme Precision Prods. v. American Alloys Corp.*, 484 F.2d 1237, 1242–43 (8th Cir.1973), different prices are at least probative of the question whether different markets exist. Moreover, while we agree that price differentials are not in and of themselves significant except insofar as they suggest the existence of different markets, appellee misperceives the allocation of burdens on its motion for summary judgment. CES has produced evidence tending to show, in light of the record as a whole, that the price differential bears on the cross-elasticity of demand between third-party's services and IBM's. We cannot say, given the ad hoc significance of price differentials in determinations of relevant markets, that IBM's consistently higher prices do not suggest the existence of separate markets.

IBM in the relevant market as a matter of law, we should nevertheless affirm[6] the dismissal of the antitrust claims on the ground that CES has not thrown into dispute the material issue of Control Data's exclusionary conduct.[7] Drawing the principle that the acquisition of or attempt to acquire monopoly power is illegal only if not accomplished by legitimate means such as "product, business acumen, or historic accident," *Grinnell Corp.*, 384 U.S. at 570–71, 86 S.Ct. at 1703–04; *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 990 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984), appellee observes that CES's sole theory of exclusionary conduct—namely, that Control Data engaged in predatory pricing—is unsupported by the record.

Pushing beyond our initial reluctance to pass on so fact-oriented an inquiry where the district court did not even speak to the issue,[8] we think that appellant has presented evidence from which it would be possible to conclude that it was devoured by Control Data's predation. It is at least debatable whether Control Data reduced prices some 20–20% below average variable cost to five customers or prospective customers of CES in an effort to recapture these service contracts.[9] The actual amounts of reduction and of average variable cost are matters peculiarly within the province of the jury to decide. *Sunshine Brooks, Ltd. v. Temple University*, 697 F.2d 90, 96–97 (3d Cir.1983).

Appellee attempts to bring this case within our holding in *Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300 (5th Cir. 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 123, 83 L.Ed.2d 65 (1984). The reliance is misplaced. *Bayou Bottling* involved competing full-line soft drink dealers who sold a variety of drinks in a variety of sizes. The defendant was accused of lowering the price of 32-ounce bottles to below the average variable cost for these products—an action which, plaintiff maintained, constituted predatory pricing. In affirming summary judgment in favor of the defendant, we held that these competitors' average variable costs had to include the full product line. Quoting the Ninth Circuit's opinion in *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 856 (9th Cir.1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978), we stated:

> "... The pricing of one size at a predatory level would not necessarily drive out rivals who were selling a full line, as is the case in this industry, unless this placed the overall price of the line at the predatory level."

*Bayou Bottling*, 725 F.2d at 305. The present case differs markedly in that appellee is alleged to have reduced the price of its maintenance services to predatory levels solely as to particular customers. Unlike in *Bayou Bottling*, where a full-line competitor would not have been unfairly threatened by the uniform decrease in price of a single product in its line, appellant has produced evidence sufficient to support the possibility that Control Data's pricing of their "product"—maintenance services—was predatory as to CES, the sole victim of Control Data's lower prices. This would be precisely the type of "conduct designed to barricade access to markets ... [that] can constitute a proscribed means of monopolization." *Woods Exploring & Producing Co. v. Aluminum Co. of America*, 438 F.2d 1286, 1307 (5th Cir.), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736

---

6. We are of course permitted to affirm a district court's grant of summary judgment on grounds other than those upon which the lower court relied. *E.g., Church of Scientology v. Cazares*, 638 F.2d 1272, 1281 (5th Cir.1981).

7. *See generally* 3 P. Areeda and D. Turner *Antitrust Law* ¶ 626, at 83 (1978) ("'Exclusionary' conduct is conduct, other than competition on the merits or restraints reasonably 'necessary' to competition on the merits, that reasonably appears capable of making a significant contribution to creating or maintaining monopoly power.").

8. Control Data's motion for summary judgment is silent on whether or not the record fails to support CES's theory of predation.

9. *See* Rostron Deposition at 316–47, 348, 361; Exhibit 24.

(1971); *Walker v. U-Haul Co.*, 747 F.2d 1011, 1015 (5th Cir.1984).

In sum, appellant's scenario of monopolization is not so devoid of evidentiary support for the section 2 claims as have been those antitrust cases where we were willing to affirm dismissals on summary judgment. *See, e.g., Transource International, Inc. v. Trinity Industries*, 725 F.2d 274, 283–84 (5th Cir.1984); *Municipal Bond*, 672 F.2d at 440–43; *Parsons v. Ford Motor Co.*, 669 F.2d 308, 313 (5th Cir.), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 72 (1982). On the contrary, CES has produced a sufficient factual showing of significant probative force with regard to both the relevant market for computer maintenance services and the predatory nature of Control Data's competitive pricing. *Cf. Powers v. Nassau Development Corp.*, 753 F.2d 457, 461–63 (5th Cir.1985). Consequently, we reverse the district court's grant of summary judgment on CES's theories of antitrust liability.

## II. THE STATE LAW CLAIMS

Appellant contends that the district court should not have dismissed its state law tort claims for wrongful interference with contract and with prospective business relations. CES theorizes that Control Data intentionally procured the breach of contracts between CES and its new customers, and that Control Data further discouraged other soon-to-be customers of CES from finalizing their contractual relationships with the new company.

With regard to the claim for contractual interference, the district court held that CES had failed to make out a prima facie case under Texas law primarily on the ground that Control Data's actions fell within the realm of justifiable competition.[10] Without passing on the merits of this rationale, we find that the claim fails for lack of any indication in the record that CES's customers breached their contracts. A third-party's efforts to induce another to exercise his right to dissolve a contract at will or to terminate contractual relations on notice does not constitute tortious interference with contract under Texas law. *Claus v. Gyorkey*, 674 F.2d 427, 435 (5th Cir.1982); *Kingsberry v. Phillips Petroleum Co.*, 315 S.W.2d 561, 576 (Tex.Civ.App. 1958); *see also* Restatement (Second) of Torts § 768(2) & comment *i* (1977). Viewing the evidence in the light most favorable to CES, we see no indication that Control Data's solicitations of CES customers had any effect other than to cause these clients to tender their thirty-day notices under the terms of their contracts. Any question of malicious intent to induce a contractual breach thus becomes irrelevant. As the Texas courts have aptly noted, " 'If an act be lawful ... an improper motive does not render it unlawful.... "Malicious motives make a bad case worse, but it [sic] cannot make that wrong which, in its own essence, is lawful." ' " *Id.* (citations omitted). Appellant has not produced evidence that its clients "breached" anything—they merely exercised their respective rights of termination as provided for in their contracts.

**10.** In Texas,
 " 'A prima facie case of wrongful interference with a contract is made out if there are alleged: (1) Intentional and willful acts; (2) calculated to cause damage to plaintiffs in their lawful business; (3) done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and (4) actual damage and loss resulting.' " *White v. Larson*, 586 S.W.2d 212, 215 (Tex.Civ. App.1979) (quoting *Tidal Western Oil Corp. v. Shakelford*, 297 S.W. 279, 280 (Tex.Civ.App. 1927) (citation omitted)); *State Nat'l Bank v. Farah Mfg. Co.*, 678 S.W.2d 661, 689 (Tex.Ct.

App.1984). In addition to holding under the third element that Control Data's actions were justifiable—a result with which we might differ absent any claim of contractual right by Control Data—the district court noted that "any 'interference' by defendant had no effect on plaintiff's right under these contracts; therefore, the essential element of actual damages or loss to plaintiff is missing from plaintiff's claims." *Supplemental Memorandum Opinion*, No. 4–78–317–K, *slip op.* at 5 (N.D.Tex.1983). Since we agree that CES has failed to establish its loss of any contractual right, we need not reach issues of justification or malice.

*See Davis v. Alwac International, Inc.,* 369 S.W.2d 797, 802 (Tex.Civ.App.1963).[11]

Beyond its argument for tortious interference with contract, CES lays claim to redress under the Texas law prohibiting interference with prospective contractual relations. We had occasion to examine this topic in some detail in *Leonard Duckworth, Inc. v. Michael L. Field & Co.,* 516 F.2d 952 (5th Cir.1975), where we observed that the Texas courts recognize claims for malicious interference with reasonably probable future contractual relations. *Id.* at 956; *see Phillips v. Vandygriff,* 711 F.2d 1217, 1230 (5th Cir.1983), *cert. denied,* — U.S. ——, 105 S.Ct. 94, 83 L.Ed.2d 40 (1984); *Verkin v. Melroy,* 699 F.2d 729, 732–33 (5th Cir.1983). The elements of this breed of tortious interference, enumerated in *Duckworth* and since recognized expressly by the Texas courts, *see, e.g., State National Bank v. Farah Manufacturing Co.,* 678 S.W.2d 661, 688–90 (Tex.Ct. App.,1984); *Lone Star Steel Co. v. Wahl,* 636 S.W.2d 217, 222 (Tex.Ct.App.,1982), are that

> (1) there was a "reasonable probability" that [plaintiff] would have entered into a contractual relationship; (2) defendant acted maliciously by intentionally preventing the relationship from occurring with the purpose of harming plaintiff; (3) the defendant was not privileged or justified, and (4) actual harm or damage occurred as a result.

*Duckworth,* 516 F.2d at 956. In the present case, Control Data contends under the third element that it was "privileged or justified" in soliciting five prospective customers from CES because the motivating force underlying its action was competition, pure and simple.[12]

Unfortunately for appellee, the argument deals no more than a glancing blow to its adversary's case. Competitive motive, while perhaps the start of the inquiry, is not of itself sufficient privilege or justification for interference with prospective business relations in Texas. Only "fair" competition will do, for "if there is sharp dealing or overreaching or other conduct below the behavior of fair men similarly situated, the ensuing loss should be redressed." *Id.* at 958 (emphasis and citation omitted).[13]

Fortunately for us, we do not have to decide whether Control Data's dealing cut too sharp, reached too far, or cast the spell of satanic intrigue that doubtless bedevils the jungle of computer repair. These remain open questions of material fact. *See Verkin,* 699 F.2d at 732–34. Control Data reduced its price for maintenance services by as much as 15% for those former clients who became customers of CES. For reasons similar to those discussed in the context of appellant's section 2 antitrust claims, it would be possible to conclude that Control Data reduced its prices to below cost with the intent of driving CES out of business.

## III. CONCLUSION

Having failed to produce evidence of a contractual breach, CES is unable to sus-

---

**11.** Our recent decision in *Deauville Corp. v. Federated Dep't Stores, Inc.,* 756 F.2d 1183 (5th Cir.1985), is not to the contrary. In *Deauville,* we held that Texas law supports a claim for interference with a terminable-at-will contract where a third-party has induced the contract's breach without any economic justification or goal other than evisceration of the underlying contract. *Id.* at 1195–96. In our case, it is clear that, even viewing the facts most favorably to CES, Control Data's alleged interference was aimed at least as much toward retrieving its previous clients as it was toward abrogating CES's contractual relations. The Texas cases will not support a claim for tortious interference with contract under these circumstances.

**12.** Appellee does not contest, nor did the district court pass upon, whether disputed issues of material fact remain as to any of the three remaining *Duckworth* factors. We thus view the merits of appellee's motion for summary judgment as turning solely on our resolution of the privilege or justification issue.

**13.** *See also Farah Mfg.,* 678 S.W.2d at 689 ("A justifiable business interest does not grant absolute privilege to interfere with a contractual relationship between others.") (citing *Frank Coulson, Inc.-Buick v. General Motors Corp.,* 488 F.2d 202, 206 (5th Cir.1974)); Restatement (Second) of Torts § 768 (1979).

tain its claim against Control Data for wrongful interference with contract under Texas law. The record does contain evidence, however, from which a factfinder could reasonably decide not to include IBM in the relevant market for maintenance of IBM 360 and 370 computers in the Dallas-Tarrant County area. Control Data may therefore be found to occupy a sufficiently high share of the relevant market to support CES's claims of monopolization and attempted monopolization. Similarly, it is debatable whether Control Data's competitive price-cutting sank to predatory levels within the meaning of section 2 of the Sherman Act, or to unfair levels within the reach of Texas's common law of tortious interference with prospective business relations. Consequently, the district court's grant of summary judgment is

AFFIRMED IN PART and REVERSED AND REMANDED IN PART.

Daniel K. Hedges, U.S. Atty., Linda M. Cipriani, C.J. Calnan, James R. Gough, Asst. U.S. Attys., Houston, Tex., for plaintiff-appellant.