**VALORES CORPORATIVOS, S.A. de C.V., Casa Chapa, S.A. de C.V., and Chapa Trading Co., Inc., Appellants,**

v.

**McLANE COMPANY, INC. and Wal–Mart Stores, Inc., Appellees.**

No. 04–95–00913–CV.

Court of Appeals of Texas, San Antonio.

Feb. 19, 1997.

Rehearing Overruled April 30, 1997.

Luther H. Soules, III, Soules & Wallace, San Antonio, John M. O'Quinn, Kendall C. Montgomery, O'Quinn, Kerensky, McAninch & Laminack, Houston, Ricardo G. Cedillo, Davis, Adami & Cedillo, Inc., San Antonio, Vincent L. Marable, III, Paul Webb, P.C., Wharton, for appellants.

Seagal V. Wheatley, J. Frank Onion, III, Julia W. Mann, San Antonio, James M. Hill, Robert B. Neblett, III, Harold R. Loftin, Jr., Small, Craig & Werkenthin, P.C., Austin, for appellees.

Before HARDBERGER, C.J., and DUNCAN and BUTTS, JJ[1].

## OPINION

DUNCAN, Justice.

Valores Corporativos, S.A. de C.V., Casa Chapa, S.A. de C.V., and Chapa Trading Co., Inc. (collectively, "Valores")[2] appeal the summary judgment against them in their suit against McLane Company, Inc. and Wal–Mart Stores, Inc. We hold the summary judgment proof does not conclusively establish the absence of an enforceable agreement between Valores and McLane Co., and Texas law does not preclude holding Wal–Mart liable for tortiously interfering with the contractual relations of its wholly-owned subsidiary, McLane Co. Accordingly, we reverse the judgment and remand the case to the trial court for further proceedings consistent with this opinion.

1. Assigned to this case by the Chief Justice of the Supreme Court of Texas pursuant to Tex. Gov't Code Ann. § 74.003(b) (Vernon 1988).

2. Valores is a holding company. Casa Chapa is a wholly-owned subsidiary of Valores, and Chapa Trading is a wholly-owned subsidiary of Casa Chapa. For convenience, we refer to all three entities as "Valores."

3. Until recently, this statement would have precluded review on the statute of frauds ground. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623,

## PROCEDURAL BACKGROUND

Valores filed suit against Drayton McLane, McLane Co., and Wal–Mart on numerous causes of action. On Valores' motion, however, all of its causes of action against Drayton McLane and many of its causes of action against McLane Co. and Wal–Mart were dismissed with prejudice. As a result of these dismissals, Valores retained claims against McLane Co. for breach of contract, breach of a confidential or fiduciary relationship, and constructive fraud; Valores retained claims against Wal–Mart for tortiously interfering with Valores' and McLane Co.'s agreement or prospective contractual relations and for knowingly participating in what it knew or should have known were breaches of fiduciary duty and constructive fraud by McLane Co. towards Valores.

On September 12, 1995, McLane Co. and Wal–Mart moved for partial summary judgment on Valores' claims for breach of contract and tortious interference with contract or prospective contractual relations. The trial court granted this motion by order signed October 6, expressly noting that it was not granting the motion on the statute of frauds ground.[3]

On October 9, McLane Co. and Wal–Mart moved for partial summary judgment on Valores' claims against McLane Co. for breach of a confidential or fiduciary relationship and constructive fraud and its claims against Wal–Mart for knowing participation. In line with the parties' waivers of the appropriate deadlines, the trial court heard and granted this motion on October 11. This second partial summary judgment, coupled with Valores' voluntary dismissals and the earlier October 6 partial summary judgment, comprised a final judgment. Accordingly, on

625 (Tex.1996). In *Cates*, however, the supreme court held that the courts of appeals should consider not only all those grounds the trial court rules on but also those grounds the trial court did not rule on but that are preserved for appellate review. *Id.* at 625–26. In this case, however, neither McLane nor Wal–Mart has sought to uphold the October 6 summary judgment on the statute of frauds ground. Accordingly, since this ground has not been preserved for appellate review, we will not consider it.

October 11, 1995, the trial court signed a final judgment incorporating all of the pertinent orders. Valores appealed.

## STANDARD OF REVIEW

We review a summary judgment *de novo*. Accordingly, we will uphold a summary judgment only if the summary judgment record establishes that there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law on a ground set forth in the motion. *Travis v. City of Mesquite*, 830 S.W.2d 94, 99–100 (Tex.1992); TEX.R. CIV. P. 166a(c). In deciding whether the summary judgment record establishes the absence of a genuine issue of material fact, we view as true all evidence favorable to the non-movant and indulge every reasonable inference, and resolve all doubts, in its favor. *Nixon v. Mr. Property Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985).

## SCOPE OF REVIEW

■ Before setting forth the factual background in this case, we must first decide an issue relating to the scope of review. In an objection and supplemental objection, Valores argues that we may not consider the summary judgment proof filed on October 9 as support for the trial court's October 6 partial summary judgment, because it was not before the trial court at that time or for that purpose. McLane Co. and Wal–Mart disagree, arguing that we may consider their October 9 summary judgment proof in support of the October 6 partial summary judgment, because it was filed before the October 11 final judgment was signed. We initially overruled Valores' objection and supplemental objection. However, after further reflection and for the reasons discussed below, we reverse our earlier ruling and now sustain Valores' objection and supplemental objection.

As a general rule, the trial court may consider only that summary judgment proof that was properly on file at the time of the hearing. *Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 269 (Tex.1992). McLane Co. and Wal–Mart are correct, however, that the rule also permits the trial court to consider proof filed after the hearing but before judgment in some circumstances. TEX.R. CIV. P. 166a(c). But this provision, "before judgment," has been "construed to mean before the summary judgment is *signed* by the trial court." TIMOTHY PATTON, SUMMARY JUDGMENTS IN TEXAS § 2.01[1][b] at 7 (2nd ed.1996). Moreover, "the record must affirmatively reflect that those late-filed documents were filed with leave of court." *Id.*

In this case, the October 9 summary judgment proof was filed *after* the trial court signed the October 6 partial summary judgment, and the record does *not* reflect the trial court permitted this proof to be filed or considered as late-filed proof with respect to the October 6 partial summary judgment. Accordingly, we presume it was not considered by the trial court as support for the October 6 partial summary judgment. *Cf., e.g.*, *Benchmark Bank v. Crowder*, 919 S.W.2d 657, 663 (Tex.1996); *Goswami v. Metropolitan Sav. & L. Ass'n*, 751 S.W.2d 487, 490 n. 1 (Tex.1988) (in the absence of order to the contrary, presume trial court did not consider late-filed proof). We therefore reverse our earlier ruling and sustain Valores' objection and supplemental objection to consideration of the October 9 summary judgment proof as support for the October 6 partial summary judgment.

## FACTUAL BACKGROUND

The summary judgment proof is voluminous and contradictory in many material respects.[4] The following statement reflects the standard of review set forth above—that is, Valores' summary judgment proof is assumed to be true, and all inferences are indulged, and all doubts are resolved, in its favor. To emphasize our point—in light of the standard of review, this statement of the factual background does not reflect McLane

4. We take this opportunity to express our appreciation to the parties and their attorneys for their excellent presentation of this case—from the separately-bound volumes of summary judgment proof to the outstanding briefs (including appendices of critical documents) and oral arguments. The attorneys' efforts have substantially lessened the work involved in considering the record and legal issues involved in this appeal.

Co. and Wal–Mart's substantial controverting proof.

In November 1990, Valores, a Mexican corporation, and McLane Co., a Texas corporation (and, as of December 10, 1990, a wholly-owned subsidiary of Wal–Mart), began exploring a joint venture for the wholesale distribution of groceries in Mexico. During the negotiations that followed, Valores was represented by its chairman, Jose Chapa, and its chief executive officer, Gilberto De Hoyos, while McLane Co. was represented by its chief executive officer, Drayton McLane, and its vice president for international affairs, Robert Hudspeth.

On September 26, 1991, after ten months of meetings, analyses, and projections, a meeting was held in Monterrey. According to De Hoyos, this meeting was for the purpose of reaching, and resulted in, a final agreement on all essential terms, as reflected in Drayton McLane's shaking hands with Chapa and De Hoyos and saying they had a deal, as well as media coverage and various correspondence, including Hudspeth's September 27, 1991 letter to Valores "re Agreements and Understandings"; Hudspeth's September 27 letter to De Hoyos congratulating him "for the leadership and vision of creating Chapa/McLane . . . ."; Drayton McLane's September 30 letter to Chapa stating that McLane Co. was "truly honored to be your partner . . . ."; and Drayton McLane's October 24 letter to Chapa stating that "[o]ur agreement in principle is all we really need, but as soon as the contract is completed, I look forward to coming to Monterrey to have a formal signing of this important document." De Hoyos further testified that he was authorized to bind Valores, and Drayton McLane was authorized to bind McLane Co., to their agreement.

The essential terms of the parties' agreement, according to De Hoyos and as substantially reflected in Drayton McLane's September 27 letter to De Hoyos, were:

▶ The name of the joint venture would be "Chapa/McLane."

▶ Chapa/McLane's business purpose would be the wholesale distribution of groceries and the continuation of Val-

ores' home delivery service near Monterrey in northeastern Mexico.

▶ Valores would contribute its "know-who," while McLane Co. would contribute its "know-how."

▶ Chapa/McLane would "be owned and capitalized equally by Valores and McLane." "Financing methods [would] be evaluated by Valores and recommendations made as to [the] best methods for [the] benefit of [the] joint venture."

▶ The "[t]otal capital investment requirements [were] estimated at 10–12,000,-000.00 U.S.D."

▶ Chapa/McLane's "Board of Directors [would] consist of six members—three from each company with chairman from Valores. Alfonso Cordero [would] serve as General Manager of Chapa/McLane."

▶ Valores would close its existing distribution centers, and Chapa/McLane would "reimburse [Valores] up to [a] maximum of 2,000,000 U.S.D. over five years for losses incurred as [a] result of facility closings. This 2,000,000.00 U.S.D. would be generated from operating profits and could be paid in a time frame shorter than five years at the discretion of McLane Company or longer if [the] profits generate[d] [were] not adequate to fund reimbursement."

▶ "In depth [d]ata [s]ystems analysis," "transportation analysis," and "[t]raining orientation schedules" were to begin and be completed and finalized "as soon as practical." "Alfonso Cordero [would] spend [a] minimum of four months at McLane divisions. David Chapa [would] receive extensive training in [the] McLane CPL Program."

▶ Preliminary, capital expenditure, operating, and cash flow budgets were "to be completed."

▶ A first draft of a written agreement was to be prepared by Valores and "forwarded to McLane."

▶ The "[t]arget date for operation start-up" was "August 1992."

In recognition of its new partner and the new company they would form, and in accordance with Mexican business custom, the following month Valores presented Drayton McLane with coins commemorating the discovery of America.

On November 1, 1991, Valores and McLane Co. issued joint press releases announcing their "agreement in principle." This press release, unlike that issued earlier to announce Wal–Mart's acquisition of McLane Co., did not state that the agreement was subject to legal documentation. After the November 1 press release, the parties began performing their agreement. For instance, David Chapa moved to Temple for management training; the "in depth systems analysis" and "transportation analysis" were begun; drafts of the written agreement were prepared, edited, and exchanged; and a site was selected for the Chapa/McLane distribution center, plans were drawn, and a groundbreaking date was set for July 1992. By the end of May 1992, McLane Co. knew virtually every aspect of Valores' wholesale grocery distribution business in Mexico—from its customer profiles and detailed customer lists to the size and number of particular items it warehoused and distributed.

Meanwhile, however, a conflict was brewing. On July 9, 1991, Wal–Mart had issued a press release announcing that it, in partnership with Direción Corporativa CIFRA, S.A. de C.V., would develop the equivalent of Wal–Mart's Sam's Clubs in Mexico. In light of this partnership, on November 11, Rob Walton, Wal–Mart's vice chairman, sent a copy of the November 1 Chapa/McLane press release to CIFRA. CIFRA wrote back, stating that Chapa/McLane was an "unexpected surprise" and "raised some doubts as to how your new venture in Mexico might affect our present business relationship." McLane Co. assured Wal–Mart, however, that no conflict existed; Wal–Mart and CIFRA were retailers, while Chapa/McLane would be a wholesale grocery distributor. Therefore, although Hudspeth mentioned CIFRA's objection to De Hoyos, Hudspeth also indicated it was Wal–Mart's problem and would be worked out by Wal–Mart and CIFRA. Unknown to Valores, however, McLane Co.'s general counsel had been instructed to "slow play" the documents intended to memorialize the Chapa/McLane agreement. At no point, however, did anyone involved identify any "deal breakers." Nonetheless, according to De Hoyos, Drayton McLane admitted to him following a late May 1992 meeting that the conflict with CIFRA was probably affecting McLane Co.'s ongoing performance of its agreement with Valores. On May 29, 1992, Wal–Mart issued a press release announcing an expanded agreement with CIFRA. Under this expanded agreement, Wal–Mart committed McLane Co. to do business in Mexico exclusively with CIFRA.

On June 3, the top executives of Valores, McLane Co., and Wal–Mart met in Dallas. At that meeting, Drayton McLane apologized for the "embarrassing situation" and explained that when he began negotiations with Valores, he owned and controlled McLane Co. But, although Wal–Mart had approved the November 1 press release announcing their agreement in principle, Wal–Mart had decided there would be no Chapa/McLane. When the Valores representatives demanded that McLane Co. honor its agreement, Wal–Mart's president, David Glass, stated that, although "this is not the way Wal–Mart does business," "this is the way it is going to be." In a subsequent letter, McLane Co.'s general counsel admitted to Valores' attorney that "the Wal–Mart/CIFRA relationship has become the controlling force."

## BREACH OF CONTRACT

In their first motion for summary judgment, McLane Co. and Wal–Mart contended their summary judgment proof conclusively established that McLane Co. and Valores never entered a binding contract because (1) a signed, written agreement was a precondition to the formation of an enforceable contract and (2) the purported agreement failed for indefiniteness. For convenience, we assume without deciding that McLane Co.'s and Wal–Mart's motion and proof were legally sufficient to shift the burden to Valores to raise genuine issues of material fact on each ground. We hold, however, that Valores met this burden.

## Requirement of a Written Agreement

■ Whether a signed, written agreement is a precondition to the formation of an enforceable contract depends upon the parties' intent. *Foreca, S.A. v. GRD Dev. Co.,* 758 S.W.2d 744, 745–46 (Tex.1988); *Scott v. Ingle Bros. Pac., Inc.,* 489 S.W.2d 554, 555 (Tex. 1972). While the absence of an intent to be bound without a signed, written agreement may be established as a matter of law, it is generally a question of fact to be decided by a factfinder. *Foreca,* 758 S.W.2d at 746; *Scott,* 489 S.W.2d at 556–57. In *Scott,* for instance, the court held that whether a contractual provision referencing a non-existent subsidiary contract was enforceable was a triable question of fact. *Scott,* 489 S.W.2d at 557. Similarly, in *Foreca,* the court held that whether a signed, written agreement was a precondition to the formation of an enforceable contract was a question of fact properly submitted to the jury even though the memorandum of agreement there at issue expressly stated that it was "subject to legal documentation." *Foreca,* 758 S.W.2d at 746; *see also id.* at 746 n. 2 (factors to consider); *Scott,* 489 S.W.2d at 556 (importance of substantial performance); *accord Crest Ridge Constr. Group, Inc. v. Newcourt, Inc.,* 78 F.3d 146, 150 (5th Cir.1996) (applying Texas law) ("the parties' conduct illustrated that they thought they had a deal").

In this case, the summary judgment proof does not conclusively establish that Valores and McLane Co. intended that an enforceable contract would await a signed, written agreement. To the contrary, Valores' summary judgment proof indicates that a signed, written agreement was intended merely to memorialize the agreement already reached on September 26. Unlike the press release in which Wal–Mart announced its acquisition of McLane Co. and the memorandum of agreement at issue in *Foreca,* the November 1 press release announcing Chapa/McLane did not state that it was subject to the execution of a definitive written agreement. Instead, it appears both parties intended and operated on the premise that "[their] agreement in principle is all [they] really need[ed]," as stated in Drayton McLane's October 24 letter. For instance, two of Valores' management personnel moved to Temple, Texas for training with McLane Co.; Valores provided McLane Co. with the names and addresses of all of its customers so that McLane Co. could determine the exact latitude and longitude of Valores' customers for entry into McLane Co.'s proprietary TRUCKS routing software; and McLane Co.'s architects and engineers selected a site for, designed, and set a ground breaking date for the Chapa/McLane distribution center.

McLane Co. and Wal–Mart insist, however, that the summary judgment proof in this case conclusively establishes the necessity of a signed, written agreement just as it did in *Continental Labs., Inc. v. Scott Paper Co.,* 759 F.Supp. 538 (S.D.Iowa 1990), *aff'd,* 938 F.2d 184 (8th Cir.1991). According to McLane Co. and Wal–Mart, "[i]n both instances, the parties claiming no contract believed that any agreement reached between the parties would be in a written form and that there would not be a binding agreement until the contract was executed by both parties." We disagree. In *Continental Labs,* the summary judgment proof established that, while Continental believed the parties were bound by an oral contract, Scott Paper "never intended to be bound by an oral agreement, but only by a written contract executed by both parties." *Continental Labs,* 759 F.Supp. at 539. In this case, on the other hand, Drayton McLane's October 24 letter, as well as the parties' performance of many aspects of the Chapa/McLane agreement, suggest that both Valores and McLane Co. believed an enforceable agreement resulted from the meeting on September 26. A signed, written agreement, while "an important document," was not required.

We recognize that in a multi-million dollar, international transaction, such as that involved in this case, the parties may very well choose to condition the creation of an enforceable contract upon the execution of a definitive written agreement. However, the issue before us is not whether the parties in other cases have chosen this path or even whether, as a matter of fact, the parties did so in this case. Rather, the issue we must resolve is simply whether the summary judg-

ment proof conclusively establishes this fact. We hold that it does not. Hudspeth's September 27 letter, as interpreted in De Hoyos' deposition testimony, coupled with the parties' performance of many aspects of their agreement and Drayton McLane's October 24 letter, are more than sufficient to raise a genuine issue of material fact as to whether the parties intended the formal signing of a written agreement as a precondition to the formation of an enforceable contract or merely as a memorial of the agreement reached on September 26. The trial court thus erred in granting summary judgment on this ground.

### Indefiniteness

■ To be enforceable, an agreement must "be sufficiently definite in its terms so that a court can understand what the promisor undertook." *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). When a material or essential term is left unresolved and subject to future negotiations, "there is no binding contract." *Id.* "Each contract should be considered separately to determine its material terms." *Id.* When the facts are not disputed, "whether an agreement fails for indefiniteness is a question of law to be determined by the court." *See id.; America's Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 622 (Tex.App.— San Antonio 1996, n.w.h).

As noted above, the standard of review requires that we view Valores' summary judgment proof as true. Accordingly, we assume, in accordance with De Hoyos' deposition testimony, that Hudspeth's September 27 letter sets forth all of the terms of the parties' agreement. The question thus presented is whether these terms are sufficient for this court to determine the undertakings of Valores and McLane Co. We hold that they are.

Regardless of whether Chapa/McLane was a partnership or a joint venture, the essential elements are the same: (1) a community of pecuniary interest such that each partner or joint adventurer has a financial interest at stake in the alleged joint enterprise; (2) an agreement to share profits; (3) an agreement to share losses; and (4) a mutual right of

control or management. *E.g., Ben Fitzgerald Realty Co. v. Muller*, 846 S.W.2d 110, 120 (Tex.App.—Tyler 1993, writ denied). If we assume Valores' summary judgment proof to be true, as we must under the applicable standard of review, each of these essential elements is established in Hudspeth's September 27 letter, as interpreted by De Hoyos in his deposition.

According to De Hoyos, Hudspeth's September 27 letter reflects (1) Valores and McLane agreed that each party would contribute one-half of the required capitalization and, as a result, each would receive one-half of the profits and suffer one-half of the losses of Chapa/McLane; and (2) Valores and McLane agreed that each would enjoy a mutual right to control and manage Chapa/McLane through the persons each designated to sit on Chapa/McLane's board of directors. Assuming these terms encompassed the parties' agreement, as required by the standard of review, we have no difficulty determining Valores' and McLane's undertakings.

McLane Co. and Wal–Mart urge, nonetheless, that essential terms are not encompassed by the September 27th letter. They point, for instance, to the absence of buy-sell, licensing, and noncompetition agreements, as well as the failure to resolve the future of Valores' home delivery enterprise, the components of Valores' and McLane Co.'s capital contributions, the date Chapa/McLane would be formed as a Mexican corporation, the date Chapa/McLane would reimburse Valores for closing its existing distribution centers, and the means for resolving tie votes on the Chapa/McLane board of directors. We agree these items would be important for the parties to consider and resolve and were, in that sense, "material." But "material," when used in this context, means more than important; it means "essential." And De Hoyos unequivocally stated in his deposition that all of the terms essential to either party were encompassed by Hudspeth's September 27 letter, and this assertion is corroborated by the drafts of the agreement that circulated between September 1991 and May 1992, which covered few, if any, of these items, and the fact that none of these terms was identi-

fied at any time by any person as an essential term or, in the parties' vernacular, as a "deal breaker."

As noted above, we are required to view Valores' summary judgment proof as true. Doing so necessarily leads to the conclusion that Hudspeth's September 27 letter, as interpreted by De Hoyos, sets forth the terms of the parties' September 26 agreement. We hold that this agreement was sufficiently definite to create a joint venture or partnership. Accordingly, the trial court erred in granting summary judgment on this ground.

In sum, the summary judgment record does not conclusively establish that Valores and McLane Co. did not enter an enforceable contract on September 26, 1991. Rather, the record demonstrates that there is substantial evidence on each side of the issues, and they must therefore be decided by a trier of fact.

### Tortious Interference

 In its first motion for summary judgment, Wal–Mart asserted that it was entitled to summary judgment on Valores' tortious interference claim because Wal–Mart was incapable of tortiously interfering with the contractual relations of its wholly-owned subsidiary, McLane Co. We disagree.

The Texas Supreme Court has not yet confronted the issue of whether a parent corporation is capable of tortiously interfering with the contractual relations of its wholly-owned subsidiary. Two of Texas' fourteen courts of appeals have dealt with the issue, and they agreed with McLane Co. and Wal–Mart. *See H.S.M. Acquisitions, Ins. v. West,* 917 S.W.2d 872, 882–83 (Tex.App.—Corpus Christi 1996, writ denied); *American Medical Int'l v. Giurintano,* 821 S.W.2d 331, 336–37 (Tex.App.—Houston [14th Dist.] 1991, no writ) (impossible for parent to interfere with wholly-owned subsidiary's contracts). The federal courts interpreting Texas law, on the other hand, have treated the issue as one of privilege, not capacity, but they have disagreed as to the extent of the privilege. *See Deauville Corp. v. Federated Dept. Stores,*

*Inc.,* 756 F.2d 1183, 1196 (5th Cir.1985) (applying Texas law) (as a matter of law, parent privileged to interfere with wholly-owned subsidiary's contracts because of superior financial interest arising out of stock ownership), *cited in Holloway v. Skinner,* 898 S.W.2d 793, 794 (Tex.1995); *see also In re ContiCommodity Serv., Inc. Securities Litigation,* 733 F.Supp. 1555, 1568 (N.D.Ill.1990) (applying Texas law) (parent that is not alter ego of wholly-owned subsidiary capable of tortiously interfering with subsidiary's contracts but interference may be privileged if in good faith and without malice), *rev'd in part on other grounds sub nom. Brown v. United States,* 976 F.2d 1104 (7th Cir.1992) *and aff'd in part on other grounds sub nom. ContiCommodity Servs. Inc. v. Ragan,* 63 F.3d 438 (5th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1318, 134 L.Ed.2d 471 (1996).[5] Other jurisdictions have held that, while a parent corporation is legally capable of tortiously interfering with its subsidiary's contracts, its interference may be privileged; they have disagreed, however, on the extent of the privilege and the placement of the burden of proof. *See, e.g., Green v. Interstate United Mgmt. Serv. Corp.,* 748 F.2d 827, 831 (3rd Cir.1984) (applying Pennsylvania law); *Phil Crowley Steel Corp. v. Sharon Steel Corp.,* 782 F.2d 781, 783 (8th Cir.1986) (applying Missouri law); *Oxford Furniture v. Drexel Heritage Furnishings,* 984 F.2d 1118, 1126 (11th Cir.1993) (applying Alabama law); *Eckholt v. American Business Info., Inc.,* 873 F.Supp. 526, 532–33 (D.Kan.1994) (applying Kansas law); *Shearin v. E.F. Hutton Group, Inc.,* 652 A.2d 578, 589–91 (Del.Ch. 1994); *Sunamerica Financial v. 260 Peachtree Street,* 202 Ga.App. 790, 415 S.E.2d 677, 684 , *cert. denied,* 202 Ga.App. 907 (1992); *GHK Associates v. Mayer Group, Inc.,* 224 Cal.App.3d 856, 883, 274 Cal.Rptr. 168 (Cal. App.1990); *T.P. Leasing Corp. v. Baker Leasing Corp.,* 293 Ark. 166, 732 S.W.2d 480, 483 (1987); *Bendix Corp. v. Adams,* 610 P.2d 24, 29–31 (Alaska 1980); *Felsen v. Sol Cafe Mfg. Corp.,* 24 N.Y.2d 682, 301 N.Y.S.2d 610, 249 N.E.2d 459, 461 (1969).

---

**5.** Neither the Fifth Circuit opinion nor the Seventh Circuit opinion deals with the claims against the parent corporation for tortiously interfering with its wholly-owned subsidiary's contracts.

We believe our resolution of this issue should be guided by our supreme court's recent decision in *Holloway*, in which the issue presented was whether Holloway, the corporation's president, director, and largest shareholder, was liable for tortiously interfering with the corporation's contract with Skinner. *Holloway*, 898 S.W.2d at 794. Ultimately, the court held that he was not liable on "no evidence grounds." *Id.* at 794. En route to its judgment, however, the court reasoned that, "to preserve the logically necessary rule that a party cannot tortiously interfere with its own contract," "the alleged act of interference must be performed in furtherance of the defendant's personal interests." *Id.* at 796. Accordingly, the court held that a corporate officer will not be treated as a "stranger to the contract" unless the plaintiff shows, as a part of its *prima facie* case, "the defendant acted in a fashion so contrary to the corporation's best interests that his actions could only have been motivated by personal interests." *Id.* In so holding, the court expressly rejected the argument that this burden should be imposed on the defendant, *id.*, as well as the notion that a corporate officer could not be held liable for tortiously interfering with the corporation's contracts if the officer was acting within the scope of his corporate authority. *Id.* at 797.

The supreme court's holding in *Holloway* recognizes and gives meaning to two principles that apply equally in the corporation-officer and parent-subsidiary contexts. First, the supreme court's holding is consistent with the legal principle that a corporation is a legal entity separate and distinct from its officers. The same is true for a parent corporation and its subsidiaries. *E.g., Gentry v. Credit Plan Corp.*, 528 S.W.2d 571,

573 (Tex.1975). Second, the supreme court's holding in *Holloway* acknowledges, as a matter of fact, that, while a corporate officer's personal interests may well be coterminous with those of the corporation, circumstances may arise in which the corporate officer pursues his personal interests to the detriment of those of the corporation. These same principles provide the foundation for the rule adopted in the jurisdictions cited above in the parent-subsidiary context—that is, a parent corporation is privileged to interfere with its subsidiary's contractual relations "when the contract threatens a present economic interest of its wholly owned subsidiary," and the parent does not "employ[ ] wrongful means or act[ ] with an improper purpose." *T.P. Leasing Corp.*, 732 S.W.2d at 483; *see also Phil Crowley Steel Corp.*, 782 F.2d at 783; *Sunamerica Financial*, 415 S.E.2d at 684; *GHK Assoc.*, 224 Cal.App.3d at 883, 274 Cal. Rptr. 168. These jurisdictions recognize that, while the financial interests of a parent corporation and its subsidiary are identical, so that a parent's interference with its subsidiary's contractual relations is usually justified, circumstances may arise in which the financial interests of neither motivate the interference.

For these reasons, we believe the supreme court's reasoning in *Holloway* also applies in the parent-subsidiary context and decline to follow our sister courts. Instead, we hold that a parent corporation is legally capable of tortiously interfering with its wholly-owned subsidiary's contractual relations.[6] The trial court thus erred in granting a summary judgment against Valores on its tortious interference claim on this ground. Valores' first point of error is sustained.

6. We note that our holding on this issue, while inconsistent with the Supreme Court's opinion in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), is consistent with our earlier holding that a parent corporation is capable of conspiring with its wholly-owned subsidiary for purposes of common law torts. *See Metropolitan Life Ins. Co. v. La Mansion Hotels*, 762 S.W.2d 646, 651–52 (Tex.App.—San Antonio 1988, writ dism'd) (recognizing that *Copperweld* limited to conspiracy claims under section 1 of the Sherman Antitrust Act and holding that corporation and wholly-owned subsidiary are separate legal entities

for purposes of common law tort actions); *accord Atlantic Richfield Co. v. Long Trusts*, 860 S.W.2d 439, 447 (Tex.App.—Texarkana 1993, writ denied).

We also recognize our holding leaves the scope of the privilege open, as well as whether Texas law will impose this burden on Valores, as a part of its *prima facie* case, as it was in *Holloway*, or on Wal–Mart, as an affirmative defense of privilege or justification. We do not decide these issues in this case because Wal–Mart did not move for summary judgment on either ground. *See, e.g., McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex.1993).

## BREACH OF FIDUCIARY DUTY AND CONSTRUCTIVE FRAUD

In their second motion for summary judgment, McLane Co. and Wal–Mart contended that the trial court's October 6 partial summary judgment precluded Valores' claim against McLane Co. for breach of fiduciary duty and its claim against Wal–Mart for knowing participation as a matter of law. If there were no binding agreement, they argued, there could be no fiduciary duty and therefore no breach of fiduciary duty by McLane Co. and, if there were no breach of fiduciary duty by McLane Co., Wal–Mart could not have knowingly participated.

On this record, therefore, the trial court's second partial summary judgment rises or falls with its first. Accordingly, since we have held that fact issues regarding the existence of an enforceable agreement require the reversal of the trial court's first partial summary judgment, we also necessarily hold that the trial court erred in granting the second partial summary judgment on Valores' causes of action for breach of fiduciary duty, constructive fraud, and knowing participation. Valores' second point of error is therefore sustained.

## CONCLUSION

As the Texas Supreme Court has stated on numerous occasions, the underlying purpose of Texas' summary judgment rule has always been a narrow one—the elimination of "patently unmeritorious claims" and "untenable defenses." E.g., Casso v. Brand, 776 S.W.2d 551, 556 (Tex.1989); City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 n. 5 (Tex.1979); Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929, 931 (1952). This same narrow purpose was noted by Professor McDonald on passage of the rule:

> The rule is intended to eliminate the delay and expense which result from paper issues which in truth are not factual issues. It has a dual thrust. It reaches groundless actions instituted by plaintiffs seeking to harass defendants into nuisance value

settlements, as well as baseless defenses interposed by defendants to seize advantage of docket delays before they can be subjected to judgments establishing their unquestionable liability. The object of the rule, therefore, is to permit either party to brush aside groundless allegations in the pleadings and to obtain prompt disposition of the action where a trial would be an empty formality.

Roy W. McDonald, Summary Judgment, 30 TEX. L.REV. 286, 286 (1952).

A trial on the issue of whether Valores and McLane Co. entered an enforceable contract on September 26, 1991 will not be "an empty formality." To the contrary, each party has substantial proof and convincing arguments to support its contention. In the face of this conflicting proof, neither we nor the trial court may decide this issue as matter of law. Nor do we believe it is appropriate to hold that Wal–Mart was legally capable of interfering with McLane Co.'s contractual relations in light of the supreme court's recent opinion in Holloway, the law in other jurisdictions, and the rule adopted by this court in the conspiracy context in Metropolitan Life. Accordingly, we reverse the judgment and remand the case to the trial court for further proceedings consistent with this opinion.

BUTTS, Justice, dissenting.[1]

I respectfully dissent.

Valores Corporativos S.A. de C.V. (Valores), Casa Chapa S.A. de C.V., and Chapa Trading Company, Inc. (Chapa) appeal from the summary judgment in favor of McLane Company, Inc. (McLane) and Wal–Mart Stores, Inc (Wal–Mart).

Valores sued McLane for breach of contract, breach of fiduciary duty,[2] and constructive fraud. Other claims were dismissed. Valores sued Wal–Mart, the parent company of McLane, for tortious interference and knowing participation in McLane's alleged breach of fiduciary duty, and other claims which were later dismissed. The trial court

---

1. Assigned to this case by the Chief Justice of the Supreme Court of Texas pursuant to TEX. GOV'T CODE ANN. § 74.003 (Vernon 1988).

2. Valores assigned portions of its claims against appellees to Chapa. Appellees do not dispute the assignment.

granted interlocutory partial summary judgments in favor of McLane and Wal–Mart. The final summary judgment was entered about a week later. The trial court ruled that no agreement, partnership, or joint venture was formed between Valores and McLane.[3]

Valores assigns two points of error: 1) The trial court erred in granting in part McLane's and Wal–Mart's motion for partial summary judgment. 2) The trial court erred in granting the appellees' motion for partial summary judgment as to the breach of fiduciary duty and constructive fraud causes of action. We should affirm.

McLane and Wal–Mart filed a motion for partial summary judgment alleging that negotiations were never completed and never reduced to writing to create a partnership/joint venture or corporation, all of which were conditions precedent to the formation of a partnership. They alleged the essential elements of a partnership were not agreed upon, including how profits and losses would be shared.[4]

Wal-Mart, as the parent corporation, alleged it could not, as matter of law, interfere with the business relations of McLane, its wholly owned subsidiary. In addition, the claims against it for constructive fraud and participation in breach of fiduciary duty would fail as a matter of law.

## Background

In November 1990, coinciding with NAFTA and interest in trade relations between the United States and Mexico, McLane and Valores began negotiations to engage in the wholesale grocery distribution business in Mexico. Robert Hudspeth, international vice-president of McLane, contacted the director-general of Valores, Gilberto De Hoyos, and they met to discuss the possibility of a partnership. Meeting with them were Drayton McLane, who headed McLane, and Jose Chapa, chairman of the board of Valores.

On December 4, 1990, Drayton McLane wrote to Chapa, expressing interest "in considering a grocery distribution joint venture with your company." Valores lacked the technology advancements of McLane and sought to modernize its distribution business in Mexico. It was anticipated that the partnership would utilize the existing Valores customer base and multi-million dollar grocery distribution business while McLane furnished the know-how and technology. Both companies would provide capital. Meetings were held and communications exchanged from December 1990, until September 1992.

The McLane concept was to build a large "McLane Company type distribution center in the Monterrey area which would take advantage of McLane's state-of-the art technology." The officers and personnel of both companies inspected the operations of each other's facilities in Mexico, the United States, and Spain. Detailed studies and extensive research of the Valores business were made. Analyses, investigations and projections were made. The parties agree that the negotiations were of a complex and international magnitude.

Hudspeth held a meeting in Temple, Texas, in March 1991, "to begin discussions and planning for a proposed partnership between Valores and McLane." McLane wrote that the purpose was to evaluate the potential of a future relationship between Valores and McLane in Mexico. Hudspeth described the "initial agreement" to Drayton McLane in April 1991: that McLane would contribute know-how, Valores would contribute business, and all subsequent capitalization would be shared. Drayton McLane acknowledged "it has tremendous potential." Hudspeth anticipated in a letter to De Hoyos that "within a few months our project could be launched."

McLane prepared a "Preliminary Mexican Joint Venture Proposal," providing in addition to the above-noted matters, that ownership of the joint venture would be split 50/50, all start-up expenses and capital expenditures would be split 50/50. Estimated capital

---

**3.** Other claims against McLane and Wal–Mart were dismissed, as were claims against Drayton McLane, Jr., who is not a party to this appeal.

**4.** The final judgment recites that the summary judgment was not granted on the statute of frauds ground.

expenditures were $11,700,700. Software would remain in Temple with communications by satellite or other means.

McLane and Valores exchanged more letters and memoranda during September 1991, pertaining to matters such as projected capital costs, projected profits, projected warehouse expenses, projected transportation needs, and the proposed agenda of a meeting in Monterrey between leaders of the companies on September 26, 1991. To finalize the joint venture was the stated purpose of the meeting.

The summary judgment deposition testimony of Jose Chapa and De Hoyos states that Valores had an agreement with McLane and Drayton McLane told them they had a deal with Valores. De Hoyos denied that any additional approval or authorization was needed, and said he was not told that the agreement was contingent upon any future happening. They shook hands at the meeting, and "we took this as an agreement."

The nucleus of the Valores and Chapa claim that a partnership existed is the September 27, 1991 unsigned memorandum from Hudspeth to De Hoyos following the meeting.[5] Valores claims that document is the partnership agreement of the parties and contains all essential elements of a partnership contract.

A letter to Valores and Chapa from McLane after that time indicated they were beginning a venture, and they were excited about the formation of the new entity, Chapa/McLane. However, no actual business was ever transacted, no buildings constructed, no truck transportation plans agreed upon, no data system completed, and no financing by Valores, as was necessary, had

been sought. The two companies continued to exchange letters and information and to conduct meetings. Additionally, both Jose Chapa and De Hoyos explained that the parties understood at that time it would be necessary for a Mexican corporation "Chapa/McLane" to be formed in the future to replace the partnership, and the partnership would then go out of existence. The summary judgment evidence does not support an agreement on this future contingency, including the matter of the value and ownership of corporation shares.

Significantly, the deposition testimony of De Hoyos confirmed Valores and Chapa and the Board of Directors of Valores believed that a final agreement between the parties must be in writing. The Valores attorney sent a draft of the *proposed partnership agreement* to McLane on October 14, 1991.

After reviewing a draft of the *proposed agreement*, the attorney for McLane, Robert McClaren, expressed in writing on October 23, 1991, many concerns about material matters which were not yet determined. During this time there were press releases in Mexico and the United States announcing that the companies would establish a wholesale distribution business in Mexico called "Chapa/McLane."

On November 5, 1991, at the insistence of McLane, Valores sent a *revised proposed partnership agreement* to the McLane attorney. However, the redraft was never finally acted upon nor approved by the two businesses. Although the companies continued to exchange information and business data, the McLane attorney continued to express concerns in writing about the *proposed partnership draft*.

5. I. Potential financial loss of closing/downsizing existing distribution business: Future joint venture to reimburse Valores [for closing losses] to be generated from operating profits.

II. Joint venture will be owned and capitalized equally.
III. Estimated capital investment requirements—10–12 million dollars.
IV. Financing methods will be evaluated by Valores and recommendations made as to best methods for benefit of joint venture.
V. In-depth Data Systems analysis will begin as soon as practical with project completion date of December 13, 1991.

VI. Transportation analysis to be completed as soon as practical.
VII. Board of Directors will consist of six members—three from each company.
VIII. Training orientation schedules for Chapa/McLane executives to be finalized as soon as practical.
IX. Budgets to be completed: Preliminary—start-up; preparation; capital expenditure; operating and cash flow.
X. *Agreement: First Draft of Agreement by Valores to be forwarded to McLane.*
XI. Target date for operation start-up: August 1992.

In the meantime, an action plan and checklist for the Monterrey distribution center was prepared by a firm recommended by McLane which included designers, engineers and architects. Attorney McClaren continued to insist that more changes and preparation of documents were needed. The Valores Board meeting minutes of December 20, 1991, state that a draft of the partnership agreement and by-laws of the company had been finished and sent to their attorney, who forwarded them to McLane for final approval. The minutes affirmatively reflect the Board recognized that McLane had not approved them. The minutes recorded that the board "awaited review of the McLane suggested corrections."

During this interval, other matters were undertaken, such as selection of a site for the Monterrey distribution center, a memorandum specifying the water and power supply requirements, and other operational planning.

Significantly, the January 27, 1992 Valores Board meeting minutes state: "To date we have not concluded formalizing our agreement; however, it was requested that [Valores attorney] Quintero give us his opinion on the partnership agreement drafted by their attorney."

In addition, the February 27, 1992, Valores Board meeting minutes mention problems with the Chapa/McLane *negotiations* because of the Wal–Mart and CIFRA (a grocery distribution business in Mexico) relationship. In this regard, there is summary judgment evidence that Valores knew that Wal–Mart had acquired the McLane Company as its subsidiary as early as December 1990.

In May 1992, Chapa and De Hoyos attended a management meeting of McLane. Drayton McLane wrote to them that "the potential for the future is truly unlimited, and we continue to be extremely excited about our partnership and joint venture."

Minutes from the May 26, 1992 meeting between the two businesses covered topics of matters to be effected in the future, such as the building lay-out of offices and loading areas with a named firm to provide lay-out drawings. These would include, among other proposed sites, the dock for "Servi–Despensa," the valuable home delivery service of Valores. It was recommended that a Chicago firm be hired to prepare drawings for bidding purposes. A Mexico firm was to design the offices. A design would be made for the cool and frozen building and the dry grocery building, and was to include all specs. None of these proposed essentials were ever undertaken or executed.

A new figure of over sixteen million dollars was estimated for the capital budget. A tentative ground-breaking date was set for July 1, 1992. A tentative bidding date for the steel frames of buildings would be by August or early September, 1992.

But on May 29, 1992, Wal–Mart announced its second expanded venture with CIFRA. Hudspeth told De Hoyos there were problems because of that venture. On June 3, 1992, representatives of Valores and McLane met in Dallas. McLane's stated position at the meeting was that McLane was "on hold" at that time on continuing to try to develop the joint venture contract due to some conflicts arising from the Wal–Mart/CIFRA business.

Summary judgment evidence shows that at that very time Valores was considering a distribution partnership with another company, Fleming, and also had contacted other U.S. grocery distribution companies. The August 18, 1992, Valores Board meeting minutes state "that we have already wasted much time in this [McLane] partnership and that it is very strained ..." The Board instructed De Hoyos to ask Hudspeth for indemnification for Valores expenses and to tell Hudspeth that "*Valores is out of the negotiations.*"

At the Valores Board meeting of September 3, 1992, members expressed concern that the Board needed to see the fine print of a contract. Some directors opined that a business relationship with the Fleming company was better for Valores's business interests and shareholders. The minutes of the Board meeting of September 26, 1992, reflect that Hudspeth telephoned De Hoyos that day and confirmed "that McLane was not interested

in forming a partnership with Valores, putting an end to the *negotiations*."

## Standard of Review

In an appeal from a summary judgment, we take as true evidence favorable to the nonmovant. *Nixon v. Mr. Property Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). If the defendant disproves at least one element of the plaintiff's claims as a matter of law, summary judgment is appropriate. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 476–77 (Tex.1995). To obtain summary judgment based on an affirmative defense, the defendant must conclusively establish all elements of the affirmative defense. *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex.1995). These established standards are reaffirmed in *Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 282 (Tex. 1996). *See* TEX.R. CIV. 166a.

We must first decide whether there was a contract or whether McLane has successfully negated one or more elements of the cause of action for breach of contract.

"A partnership is an association of two or more persons to carry on as co-owners a business for profit." TEX.REV.CIV. STAT. ANN. art. 6132b § 6(1) (Vernon 1970 & Supp.1996) (Texas Uniform Partnership Act governing this case). This relationship must be based on an agreement, either express or implied. *Coastal Plains Dev. Corp. v. Micrea, Inc.*, 572 S.W.2d 285, 287 (Tex.1978); *Corpus Christi v. Bayfront Associates*, 814 S.W.2d 98, 107 (Tex.App.—Corpus Christi 1991, writ denied). Since there was never an express agreement to form a partnership, for a partnership to exist, the agreement must be implied from the relationship of the parties. *Bayfront*, 814 S.W.2d at 107. Before an agreement to be partners can be implied, there must be proven four essential elements:

(1) a community of interest in the venture; (2) an agreement to share profits, (3) an agreement to share losses, and (4) a mutual right of control or management of the enterprise.

*Ayco Dev. Corp. v. G.E.T. Serv. Co.*, 616 S.W.2d 184, 186 (Tex.1981); *Micrea*, 572 S.W.2d at 287; *Bayfront*, 814 S.W.2d at 107–

108. The burden of proof of the existence of a partnership is upon the party seeking to establish the relationship. *Grimmett v. Higginbotham*, 907 S.W.2d 1, 2 (Tex.App.—Tyler 1994, writ denied).

The intention of the parties to a contract is a prime element in determining whether or not a partnership or joint venture exists. *Micrea*, 572 S.W.2d at 287. However, just as the words of an express contract do not necessarily control the substance of the relationship, the terms used by the parties in referring to the arrangement do not control. *Id.* at 288. Therefore, the terms used by Drayton McLane and Hudspeth, such as "joint venture" and "our partnership" do not control.

Whether or not manifestations of assent are sufficient to show that a written agreement is contemplated, or constitute a contract themselves, or are simply preliminary negotiations to a contract depends on the intent of the parties to prepare and adopt a written memorial. The circumstances may show that the agreements are preliminary negotiations. *Scott v. Ingle Bros. Pac., Inc.*, 489 S.W.2d 554, 556 (Tex.1972). In the present case, the Valores Board of Directors minutes clearly referred to the agreements and meetings as negotiations, called for an end to the negotiations, and requested indemnification for their expenditures. McLane, through Hudspeth, also considered these preliminary negotiations.

Thus, the trial court could properly conclude that the parties perceived their manifestations of assent on the matters discussed at various meetings and in the communications as preliminary negotiations.

Moreover, if an alleged agreement is so indefinite as to make it impossible for a court to fix the legal obligations and liabilities of the parties, it cannot constitute an enforceable contract. *Lynx Exploration & Prod. Co., Inc. v. 4–Sight Operating Co., Inc.*, 891 S.W.2d 785, 788 (Tex.App.—Texarkana 1995, writ denied). Although Valores offered summary judgment proof by way of depositions that the parties contemplated joint ownership of a wholesale grocery distribution business in the future, the terms of the contem-

plated agreement were so indefinite as to be impossible for the court to fix the legal obligations and liabilities of the parties. The evidence shows that the parties themselves were still in the process of arranging those matters. If an "agreement is so indefinite as to make it impossible for a court to fix the legal liability of the parties thereto, it cannot constitute an enforceable contract." *Moore v. Dilworth*, 142 Tex. 538, 179 S.W.2d 940, 942 (1944); *Lynx*, 891 S.W.2d at 789.

> In order to be legally binding, a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook. *Bendalin v. Delgado*, 406 S.W.2d 897, 899 (Tex.1966); *University Nat'l Bank v. Ernst & Whinney*, 773 S.W.2d 707, 710 (Tex.App.—San Antonio 1989, no writ). The material terms of the contract must be agreed upon before a court can enforce a contract. Where an essential term is open for future negotiation, there is no binding contract.

*T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex.1992).

Reliance by Valores on *Foreca v. GRD Dev. Co., Inc.*, 758 S.W.2d 744 (Tex.1988) is misplaced. In *Foreca* the parties had previously agreed upon the terms of a one transaction sales contract. In that case the words "subject to legal documentation" did not indicate, as a matter of law, an intention not to be bound. *Id.* at 746. The supreme court limited the holding to that factual setting by stating "in this case" this was not conclusive on the intent of the parties to contract but was a fact question. The court stressed, however, that in some cases a court may conclude, as a matter of law, that there existed no immediate intent to be bound. *Id. See* RESTATEMENT (SECOND) OF CONTRACTS § 27, cmt. c (1981).

Absent from the present complex business dealings were final agreements on many material matters, including the securing of required licensing, the Mexican government approval and agreed terms for forming the necessary Mexican corporation, the purchase of the building site, an intellectual property agreement, provisions for operation and control of the water and power supply in the Monterrey center, a "buy-sell" partnership agreement; several necessary final budgets, the financing of Valores to enable it to participate in the business, the decision on kinds and sizes of trucks and the necessary cost-efficient transportation plan, and the computer software system. Further, no funds for capitalization had been placed in escrow by either McLane or Valores, the matter of mutual control of the new corporation to be formed had not been finalized (one example—the votes of three Valores officers against the votes of three McLane officers could not break a stalemate), and there was never a necessary agreement concerning sharing the control and operation of Servi-Despensa, the lucrative home delivery service of Valores. These were all specialized material matters which sophisticated business persons, such as these owners, CEOs, vice-presidents, and chairmen of boards of multimillion dollar companies would normally reduce to writing.

While there may have been an implied agreement for McLane and Valores to share ownership and capital expenditures, the summary judgment evidence fails to show an agreement to share profits and losses. These are essential elements of a partnership agreement, and failure to agree on these elements negates the existence of a partnership. A failure by the parties to agree to share losses precludes implying the existence of a partnership. *Bayfront*, 814 S.W.2d at 108; *Gutierrez v. Yancey*, 650 S.W.2d 169, 172 (Tex.App.—San Antonio 1983, no writ). *See Grimmett*, 907 S.W.2d at 2 (agreement to share losses was neither express nor implied). In the present case any agreement to share profits and losses was neither express nor implied. Thus, because McLane conclusively negated these elements of the requisite elements of an implied agreement to be partners, the trial court correctly ruled as a matter of law that no enforceable contract existed. And when no contract exists, there can be no breach of the contract.

### Tortious Interference With Contract

As a cause of action against Wal–Mart, Valores alleged that Wal–Mart tortiously interfered with the partnership contract. We agree with Wal–Mart that Valores could not

have prevailed in this particular cause of action.

A tortious interference cause of action is established if the plaintiff proves: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) the act was a proximate cause of the plaintiff's damages; and (4) actual damage or loss resulted. *Friendswood*, 926 S.W.2d at 282.

Even if Wal–Mart cannot conclusively negate one of these four elements, it may still prevail if it conclusively establishes the affirmative defense of justification. *Id.* A party is justified in interfering with another's contract if it exercises (1) its own legal rights or (2) a good faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken. *Id.* A party to a business relationship cannot interfere with itself. *American Medical Int'l, Inc. v. Giurintano*, 821 S.W.2d 331, 335 (Tex.App.—Houston [14th Dist.] 1991, no writ).

The Fifth Circuit Court of Appeals, in applying Texas law, held that a parent and its subsidiary are so closely aligned in business interests as to render them, for tortious interference purposes, the same entity. *Deauville Corp. v. Federated Dept. Stores, Inc.*, 756 F.2d 1183 (5th Cir.1985); *Giurintano*, 821 S.W.2d at 336. The financial interests of the parent and subsidiary are identical since the parent controlled the subsidiary and its profits. *Giurintano*, 821 S.W.2d at 336. The trial court correctly ruled that Wal–Mart sustained its burden of conclusively establishing it had a legal right to interfere with the proposed agreement; therefore, it conclusively established its affirmative defense of legal justification. *See Friendswood*, 926 S.W.2d at 283.

### Breach of Fiduciary Duty and Constructive Fraud

After the trial court granted McLane's and Wal–Mart's first motion for partial summary judgment, ruling there was no enforceable partnership contract, the defendants filed their second motion for partial summary judgment regarding the claims of breach of fiduciary duty and constructive fraud. They maintained that the previous ruling of no

contract or partnership precluded these claims. The trial court agreed and granted final summary judgment.

The record throughout demonstrates the continuing independent posture of each company, with both being represented by astute businessmen. Valores had its own board of directors, officers and legal counsel. It is reputedly a successful multimillion dollar business of many years' standing. Likewise, McLane is an equally large and successful business. Neither was the beneficiary in an equitable fiduciary relationship in these transactions. *See Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507–08 (Tex.1980). These were arms-length transactions between the knowledgeable business representatives of each company. The various studies, analyses and exchange of information in this case supported both the Valores and McLane postures of businesses conducting certain required in-depth evaluations of a possible potential partnership in the future. These did not give rise to a fiduciary relationship. The evidence is also clear that the parties had not had dealings with each other in the past, so as to possibly give rise to a confidential relationship in this dealing. *See Consolidated Gas & Equip. Co. v. Thompson*, 405 S.W.2d 333, 337 (Tex.1966) (fiduciary relationship might arise outside formal relationship when, over long period of time, the parties had worked together for the joint acquisition of property previous to the particular agreement sought to be enforced). The summary judgment evidence undisputedly demonstrates that no confidential relationship existed as matter of law. The court correctly concluded as a matter of law that the evidence established conclusively there was no breach of a fiduciary relationship or constructive fraud.

Additionally, Wal–Mart is the parent entity of McLane with a unity of interest and cannot, as a matter of law, be liable for participation in an alleged breach of fiduciary duty. Further, even assuming, arguendo, that McLane breached a fiduciary duty, Wal–Mart would not be liable as a joint tortfeasor because it is not a third party who knowingly participated in the breach of a fiduciary duty. *See Kinzbach Tool Co. v. Corbett–Wallace*

*Corp.*, 138 Tex. 565, 160 S.W.2d 509, 513 (1942).

The majority opinion mistakenly relies on the fact that the trial judge *signed* the interlocutory order, claiming it became *final.* That would be true only if that order had been severed and made final, which it was not. The record reflects that the trial court signed the final summary judgment a week after the interlocutory order had been signed. Thus, the interlocutory order was subject to the plenary control of the court until final summary judgment was entered in the case. Further, TEX.R. CIV. P. 166a(d) applies only when the trial court grants the interlocutory order on some matters and reserves other issues for a jury or bench trial. In that instance, the preliminary interlocutory order would grant relief on matters of law, and "[u]pon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly." TEX.R. CIV. P. 166a(e). *See Texas United Ins. v. Burt Ford Enterprises,* 703 S.W.2d 828, 832–33 (Tex.App.—Tyler 1986, no writ). That did not happen here.

Respectfully, I would overrule the points of error and affirm the judgment of the trial court.